1999 UT 55

Graham TALLMAN, Sr., Mary Tallman, and Jeanette Yazzie, as mother and natural guardian of Timothy Tallman, Jr., the child of Timothy Tallman, being legal heirs of Timothy Tallman, deceased, Plaintiffs and Appellants,

v.

The CITY OF HURRICANE, Haukos Construction, Inc., a Texas corporation, John Does I through V, and Black Corporations I through V, Defendants and Appellees.

No. 960459.

Supreme Court of Utah.

June 1, 1999.

 

Robert J. Debry, Albert W. Gray, Nancy A Mismash, Salt Lake City, for plaintiffs.

Tim Dalton Dunn, Glen T. Hale, Salt Lake City, for defendants.

DURHAM, Associate Chief Justice:

¶ 1 This is a wrongful death case arising from the death of Timothy Tallman in a construction accident. Tallman's heirs appeal the district court's order of summary judgment entered against them. When reviewing summary judgment determinations, we review for correction of error, considering the facts and inferences in the light most favorable to the non-moving party. *See Nelson v. Salt Lake City*, 919 P.2d 568, 571 (Utah 1996); *Stevensen v. Goodson*, 924 P.2d 339, 342 (Utah 1996). With that standard in mind, we review the facts of record.

¶ 2 The City of Hurricane employed Progressive Construction Company (Progressive), a general contractor, to install water lines. Progressive then subcontracted with appellee Haukos Construction Company (Haukos) to dig the trenches in which Progressive would lay the pipe. Progressive contractually agreed to provide "all trench protection and shoring." Tallman, a Progressive employee, died when a rock from an unshored trench—dug by Haukos—fell on his head while he lubricated pipe joints. Haukos knew Progressive's workers would be in the trench and was also aware that Progressive had not provided trench protection. Haukos's policy was to not provide warning to general contractors of the need for trench protection unless their own employees were working in the trenches.

¶ 3 The trench was 7½ feet deep at the point where the falling rock killed Tallman. The construction contract required Haukos to dig the trench between 5½ and 6 feet deep. The Occupational Safety and Health Act (OSHA) requires shoring for trenches 5 feet or deeper that are not entirely in stable rock. *See* 29 C.F.R. § 1926.652(a) (1997). While Progressive believed that the digging occurred in solid rock, no engineer examined the trench for Progressive.

¶ 4 The appellants, Tallman's heirs, sued Haukos for common law negligence. The

trial court granted Haukos's request for summary judgment, stating:

> [A]s a matter of law, the subcontract between Haukos and Progressive imposed no duty upon Haukos to make the subject workplace safe; Haukos was not in control of the deceased employee or his actions, and Haukos was not in control of the workplace when and where the accident occurred; UOSHA [Utah Code Ann. 34–A–6–202(1) (1997)] regulations did not create a duty owed by Haukos to any employee of Progressive.

¶ 5 As noted earlier, we review summary judgment decisions for correction of error. "Furthermore, because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, 'summary judgment is appropriate in negligence cases only in the clearest instances.'" *Nelson,* 919 P.2d at 571 (quoting *Dwiggins v. Morgan Jewelers,* 811 P.2d 182, 183 (Utah 1991)). However, "without a duty, there can be no negligence as a matter of law, and summary judgment is appropriate." *Rocky Mountain Thrift Stores Inc. v. Salt Lake City Corp.,* 887 P.2d 848, 852 (Utah 1994). If Haukos owed Tallman a duty under any legal theory, and there are disputed facts as to whether that duty was breached, then this court must reverse the summary judgment.

■ ¶ 6 As the district court correctly held, neither the contract nor OSHA standards, by themselves, created a duty which ran from Haukos to Tallman. We conclude, however, that a common law duty may have existed, depending on factual issues still in dispute. Haukos has urged us to hold that the contract language requiring Progressive to provide "all trench protection and shoring" precludes any common law duty on its part to ensure that the trenches were safe when turned over to Progressive's workers. Certainly, as to financial responsibility for the cost of shoring and obligations to perform, the contract governs the duties of the parties. However, in some circumstances, the common law imposes independent duties on activities, even those otherwise regulated by contract, that create risks of harm to third parties. Thus, although Haukos had no contractual obligation to shore or protect any of the trenches it created, it may have had an obligation to warn users or even to prevent the use of those trenches while they remained in a dangerous condition known to Haukos.

## I. FORESEEABILITY RULE

¶ 7 The common law originally relieved a contractor of any liability for injuries to third parties after the contractee accepted the work. *See Horton v. Goldminer's Daughter,* 785 P.2d 1087, 1089 (Utah 1989) (discussing history of old rule and emergence of new rule); *Thompson v. Burke Eng'g Sales Co.,* 252 Iowa 146, 106 N.W.2d 351, 355–56 (1960) (overturning old rule and adopting foreseeability rule). Courts began to abandon this rule in the early 1960's in favor of a general negligence rule based upon the foreseeability of the harm. *See Horton,* 785 P.2d at 1089. One Utah case cited this emerging rule with approval but did not expressly adopt it. *See Leininger v. Stearns–Roger Mfg. Co.,* 17 Utah 2d 37, 404 P.2d 33, 36 (1965). A subsequent case impliedly adopted the rule without specifically discussing it. *See Williams v. Melby,* 699 P.2d 723, 729 (Utah 1985). Finally, a third case struck down as unconstitutional a statute of repose that the legislature had enacted in anticipation of this rule's application in Utah. *See Horton,* 785 P.2d at 1096.

■ ¶ 8 In light of this somewhat murky history, we deem it advisable to announce unambiguously that Utah follows the foreseeability rule set forth in the Restatement (Second) of Torts and followed by a majority of states. *See Minton v. Krish,* 34 Conn.App. 361, 642 A.2d 18, 21 (1994); Restatement § 385 (1965); W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 104A, at 723–24 (5th ed.1984). We rely on this rule because it accurately reflects current tort law theory and eliminates the archaic principle of privity. *See Thompson,* 106 N.W.2d at 356; *Hanna v. Fletcher,* 231 F.2d 469, 474 (D.C.Cir.), *cert. denied sub nom Gichner Iron Works v. Hanna,* 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956).

## II. COMMON LAW LIABILITY FOR DANGEROUS CONDITION ON LAND/MANUFACTURE OF CHATTEL

¶ 9 The creator of an artificial condition on land may be liable to others—both upon or outside of the land—for physical harm caused by its dangerous nature. *See* Restatement § 385. The subsequent acceptance by the possessor of the completed condition does not abrogate this duty. *See id.* The Restatement further emphasizes that this duty also applies to those who manufacture chattel for others' use. *See id.* § 385 cmt. a (citing §§ 394–98, 403–04); *id.* § 389. For our purposes in reviewing these rules of liability, it may be helpful to analogize the digging of a trench to the manufacturing of a chattel. In this analogy, the defendant's production of a completed trench—one safe for others' use—is analogous to the manufacture of a completed product. The digging of an unsafe and inherently dangerous trench may thus be analogized to the manufacture of an unfinished, inherently dangerous product. *See* Restatement § 385.

Section 385 of the Restatement states:

> One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

*Id.* at § 385.

¶ 10 Section 389 of the Restatement then underscores the nature of the duty owed by the supplier of an unfinished, inherently dangerous product. That section provides:

> One who supplies directly or through a third person a chattel for another's use, *knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put,* is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use.

*Id.* § 389 (emphasis added).

¶ 11 In this case, Haukos apparently dug the unshored trench that collapsed and killed Tallman through unstable rock. This unshored trench was also over 5 feet in depth—a violation of both OSHA and UOSHA requirements that trenches over 5 feet deep have shoring to protect workers. *See* 29 C.F.R. § 1926.652(a); Utah Code Ann. § 34A–6–202(1). As noted above, Haukos's production of such an inherently dangerous trench is analogous to the production of an unfinished and inherently dangerous manufactured product. Thus, notwithstanding the fact that the "manufacture" was incomplete, a duty running from Haukos to employees of Progressive may exist under the Restatement.

¶ 12 First, Restatement § 389, as previously mentioned, acknowledges a duty where the supplier of a chattel knows or has reason to know that the chattel "is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put." Restatement § 389.

¶ 13 The facts indicate that Haukos was aware that Progressive did not undertake any precautionary measures, notwithstanding Progressive's contractual responsibility to do so. From this, a jury might infer that Progressive was unaware that the trench was deeper than 5 feet or that it was dug through unstable rock. Yet, it was Haukos's policy not to warn or undertake other precautionary measures unless its own employees were working in the cut trenches. Hence, there are issues of fact as to whether Haukos (the supplier) knew or had reason to know that its product (the trench) was dug into unstable rock or was otherwise unsafe as supplied and whether Haukos knew or had reason to know that the product was unlikely to be made reasonably safe before Tallman (the end user) was to use it. *See id.* The resolution of these issues is properly within the domain of a jury.

¶ 14 A related query is whether Progressive's use of the trenches occurred so soon after Haukos' digging that it was unlikely

that the trench would be made safe. The comments to Restatement § 389 elaborate on this point.

> Even though a chattel when turned over to another for his own or a third person's use is in a condition dangerous for the use for which it is intended, the circumstances may be such that the supplier as a reasonable man has no reason to believe that it is unlikely that the chattel will be made safe before being used. On the other hand, the circumstances may be such that *although the chattel is capable of being made safe for use, the person supplying it should realize the unlikelihood that this will be done before it is used.* Among circumstances which render this unlikely are the facts that the *chattel is to be used so soon after it is turned over that it is substantially certain that no change will be made in it.* It is, however, not enough to bring the situation within the rule stated in this Section that the supplier of the chattel should merely suspect that the chattel will be used before it is made safe. A substantial probability is necessary.

*Id.* § 389 cmt. c (emphasis added).

¶ 15 Thus, even if the trench was "capable of being made safe for use," the Restatement underscores the importance of a jury deciding whether Haukos realized the unlikelihood that shoring would be completed before the trench was used by Progressive's employees. *See id.* The practice on this particular construction site was for Haukos to cut the trench, while Progressive's employees followed closely behind, installing pipe in the trench. Therefore, it seems possible, if not likely, that Haukos was aware that Progressive's employees would be working in the recently-dug, unshored trench. Summary judgment was inappropriate under the principles of Restatement § 389 because issues of fact exist as to (1) whether Haukos knew of the danger created by the unshored trench, and (2) whether Haukos knew that the trench would be used so soon after digging that no shoring would be done prior to the trench's use by Progressive's employees.

■ ¶ 16 Second, a material issue of fact exists as to whether Haukos knew that the manner in which the trench was manufac-

tured would make it dangerous for the use for which it was supplied. Restatement § 395 discusses the negligent manufacture of chattel that is dangerous unless carefully made. It emphasizes that a manufacturer is liable for physical harm caused by a chattel when he fails to exercise reasonable care in its manufacture and the negligence involves an unreasonable risk of harm to those who will use it. *See id.* The comments to Restatement § 395 specifically provide:

> A manufacturer of parts to be incorporated in the product of his buyer or others is subject to liability under the rule stated in this Section, if they are so negligently made as to render the products in which they are incorporated unreasonably dangerous for use. So too, a manufacturer of raw material made and sold to be used in the fabrication of particular articles which *will be dangerous for use unless the material is carefully made, is subject to liability if he fails to exercise reasonable care in its manufacture.*

Restatement § 395 cmt. m (emphasis added).

¶ 17 The facts indicate that Haukos was aware that Progressive was not shoring the recently-dug trenches. Haukos was apparently also aware that the trench was dug at a depth exceeding both OSHA and UOSHA standards, and that Progressive's employees would enter it soon after digging was completed. Thus, a second set of disputed facts arises: whether Haukos knew or should have known that the trench would be dangerous, and whether Haukos exercised reasonable care in the production of the trench.

¶ 18 Third, a jury may properly find a duty if Haukos's product created an inherently dangerous condition. "[S]omething which is inherently dangerous must be so imminently dangerous in kind as to imperil the life or limb of any person who uses it." *Seitz v. Zac Smith & Co. Inc.,* 500 So.2d 706, 710 (Fla. Dist.Ct.App.1987). OSHA standards and the Associated General Contractors of America (AGC) Manual of Accident Prevention both require shoring of trenches like the one in this case to prevent harm to people working in trenches. *See* 29 C.F.R. § 1926.652(a); *Balagna v. Shawnee County,* 233 Kan. 1068, 668 P.2d 157, 164–65 (1983) (discussing shor-

ing requirements for trench ten feet long and five feet deep made in clay). Because these regulations exist to promote and preserve safety, failure to follow them may be evidence of unsafe procedures. *See Dunn v. Brimer*, 259 Ark. 855, 537 S.W.2d 164, 165–66 (1976) (using OSHA regulations as evidence of negligence outside employer-employee relationship); *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1091 (Del.Super.Ct.1994) ("Allowing the OSHA requirements to serve as a guide for a standard of conduct is not inconsistent with the federal OSHA statutes."); *Burmaster v. Gravity Drainage Dist. No. 2*, 448 So.2d 162, 164 (La.Ct.App.1984) (finding testimony of two expert witnesses sufficient basis for judge's finding of unreasonably hazardous/inherently dangerous conditions); Restatement § 288B(2).

■ ¶ 19 The evidence in this case indicates that a trench built in unstable rock at a depth greater than five feet can cave in at any time without any human intervention. Individuals entering such a trench risk death or injury. If Haukos created an inherently dangerous condition, then it had a duty to take reasonable precautions to protect persons exposed to that condition. Because the evidence in this case is suggestive of an inherently dangerous condition, a jury must make a determination on that question of fact. *See Eisbach v. Jo–Carroll Elec. Coop. Inc.*, 440 F.2d 1171, 1173 n. 2 (7th Cir.1971) (finding error in failure to submit inherently dangerous question to jury where Secretary of Agriculture "found a substantial question" about safety of pesticide).

■ ¶ 20 Finally, the creator of an artificial condition on land has a duty to perform its work with reasonable care to avoid harm to people who might foreseeably come in contact with the condition. An industry-wide standard of conduct often delineates reasonable conduct under the circumstances. *See* 57A Am.Jur.2d Negligence § 185 (1989); *see also Rossell v. Volkswagen of Am.*, 147 Ariz. 160, 709 P.2d 517, 523 (1985) (holding "rule in negligence cases shall continue to be that evidence of industry custom and practice is generally admissible as evidence relevant to whether defendant's conduct was reasonable under the circumstances"), *cert. denied*, 476

U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986).

■ ¶ 21 In determining the appropriate standard of conduct, the Restatement permits courts to adopt a standard from legislative enactments or administrative regulations which do not themselves purport to establish the standard. *See* Restatement § 285. Thus, despite UOSHA's provision prohibiting its use to affect common-law rights, duties, or liabilities of employers, the factfinder may look to UOSHA and OSHA for evidence of industry standards in certain circumstances. *See Figgs*, 652 A.2d at 1091; Utah Code Ann. § 35–9–20 (1994) (currently Utah Code Ann. § 34A–6–110 (1997)). The Restatement provides the following guidelines for the adoption of legislative standards:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Restatement § 286. OSHA and UOSHA explicitly purport to protect the safety and health of workers at work. *See* 29 C.F.R. § 1926.10 (1997); Utah Code Ann. § 34A–6–102 (1997).

■ ¶ 22 Tallman was a worker injured on the job, thus satisfying clauses (a) and (b) of Restatement § 286. OSHA has specifically required that trenches over five feet in depth and dug in unstable rock have trench protection to prevent workers from being injured in cave-ins. *See* 29 C.F.R. § 1926.652(a). UOSHA has adopted these standards. *See* Utah Code Ann. § 34A–6–202(1) (1997). Tallman worked in a trench that was deeper than five feet and was apparently dug in unstable soil without trench protection. The trench caved in and killed

him; therefore, this case implicates clauses (c) and (d) as well. Thus, in this case we may adopt OSHA and UOSHA regulations as evidence of the standard of reasonable care in the industry. Because OSHA standards are so widely known, understood, and followed, they constitute a legitimate source for the standard of reasonable care, and we hereby approve their use as evidence of such.

¶ 23 Violations of legislative or regulatory standards adopted by this court constitute negligence. *See* Restatement § 288B(1). According to the appellants' affidavits, OSHA required Haukos, as the condition's creator, to make sure safety measures were taken. If the appellants can establish the necessary facts at trial, the jury may find that Haukos owed a duty to Progressive's employees.

## III. CONCLUSION

¶ 24 This opinion dispenses with the privity requirement in tort cases involving an independent contractor who creates artificial conditions on land. Because a duty may exist running from the creator of the condition to the employees of the possessor, several questions of material fact remain, precluding judgment as a matter of law. They are as follows: (1) whether Haukos knew that the trench had been cut through unstable rock 7½ feet deep; (2) whether Haukos knew or had reason to know the trench was unsafe as dug and was unlikely to be made reasonably safe before Tallman was to use it; (3) whether Haukos knew the trench would be used so soon after digging that it was unlikely there would be any substantial change in its condition; (4) whether Haukos knew the trench would be dangerous unless carefully made; (5) whether the unshored trench constituted an inherently dangerous condition; and (6) whether Haukos failed to follow the recommended industry standard. We therefore reverse the district court's grant of summary judgment and remand for further proceedings in accordance with this opinion.

¶ 25 Justice STEWART and Judge JACKSON concur in Associate Chief Justice DURHAM's opinion.

¶ 26 Chief Justice HOWE concurs in the result.

¶ 27 Having disqualified himself, Justice RUSSON does not participate herein. Judge NORMAN JACKSON of the Utah Court of Appeals sat.

ZIMMERMAN, Justice, concurring:

¶ 28 I concur in the majority opinion because it seems compelled by the Restatement provisions relied upon. When viewed in a larger light, however, there is a certain absurdity to today's classic end-run of the workers compensation statute's ban on employees suing employers for injuries on the job. The death of the employee here was apparently caused because his employer, Progressive, did not fulfill its tort obligation to its employee to provide a safe workplace, and Progressive did not fulfill its contractual obligation to Haukos to provide shoring in the trenches that Haukos dug. Yet the defendant sent back for trial on the question of its negligence is Haukos, the party expressly relieved by contract from providing shoring, and the party I assume was induced to bid less for the job because of this contractual provision. After today's decision, one can assume that Haukos and other similarly situated subcontractors will never again be lured into a contract in which the general contractor agrees to see that safety measures are taken. For Haukos, however, that lesson has been learned late.[1]

---

1. I assume that the question still remains as to whether Progressive may have to indemnify Haukos for failing to provide the shoring, thus completing the circle of avoidance of the workers compensation statute's limitation on employee tort actions against employers.