### A06A0660. GULFSTREAM AEROSPACE SERVICES CORPORATION v. UNITED STATES AVIATION UNDERWRITERS, INC. et al.
(635 SE2d 38)

BERNES, Judge.

A used airplane caught fire during flight and sustained signifi-cant damage. Appellees commenced this tort action and alleged that appellant negligently inspected the airplane's maintenance logbooks on two separate occasions prior to the fire. Appellant moved for summary judgment on appellees' tort claims, contending that the

Utah economic loss doctrine barred the claims as a matter of law. The trial court declined to grant summary judgment in favor of appellant and denied appellant's motion for reconsideration. Thereafter, the trial court granted a certificate for immediate review, and this Court granted the application. For the reasons discussed below, we affirm in part and reverse in part.

On appeal from the denial of summary judgment, "we view the evidence and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (Citation and footnote omitted.) *Snellgrove v. Hyatt Corp.*, 277 Ga. App. 119, 119-120 (625 SE2d 517) (2006). So viewed, the record reflects that a 1989 Gulfstream-IV business airplane was damaged as a result of a fire that ignited in its left engine in March 1999. Appellees (plaintiffs below) are the owners and operators of the damaged airplane — Wm. Wrigley Jr. Company and its aircraft division, Zeno Air, Inc. — and the airplane's insurer, United States Aviation Underwriters, Inc. ("USAU"). Appellant (defendant below) is Gulfstream Aerospace Services Corporation f/k/a K-C Aviation, Inc. ("GASC"), which performed certain repair and inspection work on the airplane before the fire. GASC is a subsidiary of Gulfstream Aerospace Corporation ("Gulfstream"), the manufacturer of the airplane that issued certain airplane service bulletins at issue in this case.[1]

*Service Bulletins Generally.* Gulfstream issues three kinds of service bulletins to its customers regarding safety concerns, upgrades, and/or needed modifications to its airplanes. First, Gulfstream issues Customer Bulletins ("CB") to inform customers that a particular airplane part, system, or component is not fully performing as expected or potentially may create an unsafe condition. Compliance with all CBs is mandatory. Second, for problems that might pose an increased safety risk, Gulfstream issues Alert Customer Bulletins ("ACB"), which require action to correct an identified safety problem within a shorter period of time than CBs. Third, Gulfstream issues Aircraft Service Changes ("ASC") when it develops a modification or upgrade for any parts or components on an airplane. An ASC may be optional, recommended, or mandatory.[2]

---

[1] The company that is now GASC appears in *two* capacities in this lawsuit (although it is only one defendant) because the logbook reviews at issue occurred before GASC existed in its current form. In July 1998, parent Gulfstream purchased K-C Aviation, Inc. – which included a Dallas facility and an Appleton, Wisconsin facility involved in this matter – and renamed the business "Gulfstream Aerospace Services Corporation." For the sake of clarity, we will refer separately to "K-C Aviation" and "Gulfstream Appleton" in discussing the facts and contracts at issue.

[2] In addition to service bulletins issued by Gulfstream, the Federal Aviation Administration ("FAA") promulgates Airworthiness Directives ("AD"), which are issued when a condition on an aircraft presents a serious safety risk.

By law, an airplane owner or operator must maintain a record of maintenance performed on the airplane. See 14 CFR § 91.417 (a). Accordingly, when an airplane owner or operator complies with a particular safety bulletin, the airplane's logbooks must be annotated to reflect compliance. See id. Subsequent owners, operators, and maintenance personnel rely on the logbook entries in order to determine whether previous service bulletins have been complied with and thus to determine what kind of work needs to be performed on an airplane. To encourage complete and accurate disclosure in airplane logbooks, penalties exist to punish inaccurate or otherwise misleading logbook entries. See 14 CFR § 13.14.

*The 1995 Service Bulletins.* In 1995, Gulfstream discovered that the alternator feeder cable and hydraulic pump pressure line in the engine compartment of certain G-IV aircraft (which includes the airplane now owned by appellees) were prone to possible chafing. Accordingly, Gulfstream issued two service bulletins: (1) Alert Customer Bulletin No. 17 ("ACB 17") and (2) Aircraft Service Change No. 372 ("ASC 372"). ACB 17 mandated a one-time inspection for the chafing condition and specifically required compliance with ASC 372. In turn, ASC 372 required the installation of clamps on the alternator feeder cable to eliminate chafing.

At the time the service bulletins were issued, the airplane was owned by a third party, Dresser Industries. On January 12, 1996, Dresser recorded in the airplane's logbooks that it had complied with ACB 17. The licensed aircraft mechanic who performed the procedure for Dresser indicated in the aircraft logbook that there was "no chafing noted" on either the left or right engine alternator feeder cables. However, Dresser apparently did not comply with ASC 372; the anti-chafing clamps required by ASC 372 were never installed on the airplane.

*K-C Aviation, Inc.'s 1997 Logbook Review.* In 1997, a subsidiary of Wm. Wrigley Jr. Company purchased the used airplane. As a condition of sale, Wrigley arranged for a pre-purchase evaluation of the airplane by K-C Aviation, Inc. at the latter's Dallas facility. To accomplish the evaluation, the parties entered into a Proposal for Work (the "Proposal"). The Proposal included a two-page document entitled "AIRCRAFT PREPURCHASE WAIVER OF LIABILITY AND ALL EXPRESS AND IMPLIED WARRANTIES" (the "Waiver Agreement").

Under the Proposal, K-C Aviation agreed to conduct certain inspections and evaluations of the airplane and its components, including a "Record Review Evaluation." Specifically, Paragraph 3.1 of the Proposal stated that K-C Aviation would "Perform a Pre-purchase Records Review including . . . Customer Bulletins and Aircraft Service Changes."

In July 1997, K-C Aviation carried out its inspection and evaluation of the airplane and issued its "Aircraft Evaluation" report. The report included a section addressing the results of K-C Aviation's review of the airplane's logbooks for compliance with service bulletins. The report stated that there was "[n]o record of compliance" with CBs 71, 81A, 82, and 83. By not including ACB 17 in the noncompliance list, the report correctly reflected that the airplane's logbooks showed that there had been compliance with ACB 17. The report, however, did not include ASC 372 in the noncompliance list.

*Gulfstream Appleton's 1998 Logbook Review.* A year and a half later, in December 1998, appellee Zeno Air asked Gulfstream Appleton to perform certain repair and inspection work on the airplane at the latter's Wisconsin facility. Before the work was conducted, the parties entered into a "Work Authorization" contract. The Work Authorization did not mention or refer to any review of the airplane's logbooks that would be conducted. Although the Work Authorization did not mention a review of the logbooks, the invoice prepared by Gulfstream Appleton after completing its repair and inspection work states that it "performed AD & CB research" and forwarded the results to Zeno Air. An "Aircraft Services Changes Research List" produced by Gulfstream Appleton during discovery suggests that the logbooks also were reviewed for compliance with over 30 different ASCs, including ASC 372.

*The 1999 Fire.* On March 13, 1999, as the airplane was in flight over Utah, a fire broke out in the airplane's left engine, requiring the pilot to make an unscheduled landing in Colorado. No one was injured as a result of the fire or subsequent landing; however, the airplane itself was damaged and required significant repairs. It is undisputed for purposes of this appeal that the fire resulted from chafing between the unclamped alternator feeder cable and a metal fuel line, resulting in electrical arcing that burned a hole in the fuel line, which in turn caused fuel to leak out onto the engine and ignite. Appellees presented evidence that if clamps had been placed on the alternator feeder cable in compliance with ASC 372, the chafing and fire would not have occurred.

*The Present Lawsuit.* Appellees filed the instant tort action against several parties, including appellant GASC, contending that K-C Aviation and Gulfstream Appleton negligently conducted the two logbook record reviews, and thus failed to discover and report to appellees that there had not been compliance with ASC 372. Appellees contend that the alleged negligence resulted in the fire and caused appellees to incur significant repair costs.

On June 15, 2004, the trial court denied appellant's motions for summary judgment brought on behalf of K-C Aviation and Gulfstream Appleton, based in part on the fact that there was a dispute

concerning which state's laws should govern. Factual issues related to the choice of law dispute subsequently were tried before a jury. Based on the jury's resolution of certain factual issues, the trial court ruled that Utah law would apply to the tort claims in this case. The trial court further ruled that Texas law would govern the validity and interpretation of the disclaimer and release provisions contained in the Waiver Agreement.[3]

Appellant filed two renewed motions for summary judgment, one for the tort claims pertaining to the 1997 K-C Aviation logbook review, and another for the tort claims pertaining to the 1998 Gulfstream Appleton logbook review. Among other things, appellant argued that appellees' claims were barred by the Utah economic loss doctrine in light of the commercial contracts between appellees and K-C Aviation and Gulfstream Appleton. The trial court denied the renewed motion for summary judgment pertaining to the K-C Aviation logbook review on April 21, 2005.[4]

Appellant filed a motion for reconsideration. On June 13, 2005, the trial court denied reconsideration of its previous order denying appellant's renewed motion for summary judgment. On that same date, the trial court entered a separate order denying the renewed motion for summary judgment pertaining to the Gulfstream Appleton logbook review. Appellant obtained a timely certificate of immediate review from the trial court's order denying its motion for reconsideration, and this Court subsequently granted appellant's application for interlocutory appeal.[5]

"Summary judgment is appropriate where the moving party shows he is entitled to judgment as a matter of law and there is no genuine issue as to any material fact. OCGA § 9-11-56 (c)." *My Fair Lady of Ga. v. Harris*, 185 Ga. App. 459, 460 (364 SE2d 580) (1988). Here, appellant GASC contends that the trial court should have granted it summary judgment because appellees' tort claims — which centered on allegations of negligent inspection of the airplane's logbooks for compliance with service bulletins — were barred under the Utah economic loss doctrine as a matter of law. Appellant argues

---

[3] Neither party contests the choice of law determinations made by the trial court.

[4] It appears that the trial court inadvertently failed to enter an order addressing the separate renewed motion for summary judgment pertaining to the Gulfstream Appleton logbook review at that time.

[5] Appellant did not obtain a certificate of immediate review from the trial court's order denying the renewed motion for summary judgment pertaining to the Gulfstream Appleton logbook review. However, since we already have jurisdiction to address the trial court's order denying appellant's motion for reconsideration under OCGA § 5-6-34 (b), we have jurisdiction to address the order denying the renewed motion for summary judgment under OCGA § 5-6-34 (d). See, e.g., *Aetna Cas. & Surety Co. v. Cantrell*, 197 Ga. App. 672, 672-673 (1) (399 SE2d 237) (1990).

that the doctrine bars appellees' claims since the duty to inspect was created, defined, and limited by the contractual agreements between the parties. Additionally, appellant contends that there was no independent tort duty imposed upon it to inspect the logbooks for service bulletin compliance. In contrast, appellees maintain that the Utah economic loss doctrine does not apply because they are seeking damages for property damage, the contracts between the parties allegedly did not set forth a standard of care for the inspections of the logbooks, and appellant owed them independent tort duties arising separately from the parties' contracts.

Our review of the record and applicable case law leads us to conclude that the trial court erroneously denied summary judgment to appellant on appellees' tort claims predicated on the logbook review by K-C Aviation, but properly denied summary judgment on the claims predicated on the review by Gulfstream Appleton.

> The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care.

(Citations omitted.) *Hermansen v. Tasulis*, 48 P3d 235, 239 (II) (Utah 2002). The Supreme Court of Utah has expressly adopted the economic loss rule as interpreted and applied by Colorado courts. See id. at 240. Under that rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." (Emphasis omitted.) Id., quoting *Grynberg v. Agri Tech, Inc.*, 10 P3d 1267, 1269 (Colo. 2000). See *Town of Alma v. AZCO Constr.*, 10 P3d 1256, 1264 (Colo. 2000). Instead, the party is limited to seeking redress under contract law. *Town of Alma*, 10 P3d at 1262. Conversely, "[w]hen an independent duty exists, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." (Citation and punctuation omitted.) *Hermansen*, 48 P3d at 240. Hence, "[t]he proper focus . . . under the economic loss rule is on the source of the duties alleged to have been breached." *Grynberg*, 10 P3d at 1269 (II).

Based on this Utah and Colorado case law, a determination of whether the economic loss rule bars appellees' tort claims requires resolution of two primary questions. First, we must resolve whether the losses incurred by appellees were economic losses of the type covered by the rule. Second, we must resolve whether the source of

the duty of care alleged to have been breached by K-C Aviation and Gulfstream Appleton in carrying out the logbook review was a contract between the parties or some other independent source.

1. *Whether Appellees Have Sustained An "Economic Loss."* Appellees contend that the economic loss rule has no application in this case because they are seeking damages for property damage, which they assert is different from economic loss. Economic loss must be distinguished from physical harm to property, since the latter is recoverable in tort. See *Town of Alma,* 10 P3d at 1262 (II) (C) ("Tort law is designed to protect all citizens from the risk of physical harm to their persons or to their property.").

> Economic loss is defined as[ d]amages for inadequate value, *costs of repair and replacement of the defective product,* or consequent loss of profits — without any claim of personal injury or damage to *other* property [—] as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

(Citation and punctuation omitted; emphasis supplied.) *Maack v. Resource Design & Constr.*, 875 P2d 570, 580 (Utah Ct. App. 1994). It follows that "[d]amages for the cost of repair and replacement of property *that [was] the subject of the contract* constitute economic loss damages." (Emphasis supplied.) *Town of Alma,* 10 P3d at 1264 (II) (E). Conversely, physical harm to property, recoverable in tort, encompasses damage to property *other than that which was the very subject of the parties' contract.* See id.

Here, appellees seek to recover repair costs for damage to the airplane that was the subject of the inspection contracts. Therefore, contrary to appellees' assertion, appellees are seeking economic loss damages that come within the ambit of the economic loss rule. See *Town of Alma,* 10 P3d at 1264; *Maack,* 875 P2d at 580. See also *Ramerth v. Hart,* 983 P2d 848, 850-851 (Idaho 1999) (damage to airplane and its engine allegedly resulting from negligent inspection and repair of airplane constituted economic loss damages).

2. *Source Of The Duties Alleged To Be Breached.* The next step of our inquiry is to determine the source of the duty of care alleged to have been breached by K-C Aviation and Gulfstream Appleton. In order to make this determination, we first must look to the contract between the parties, and "[i]f the tort claims are based on duties that are imposed by contract, then contract law provides the remedies for [the] economic losses." (Citation omitted.) *Parr v. Triple L & J Corp.*, 107 P3d 1104, 1107 (II) (Colo. Ct. App. 2004). "If a duty is found in the contract, . . . it is improper further to analyze the existence of an

independent tort duty in determining whether an economic loss may be recovered." (Citation omitted.) Id. at 1108 (II) (B). See *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P3d 66, 74 (II) (A) (3) (Colo. 2004) ("If we conclude that the duty of care owed [the parties] was memorialized in the contracts, it follows that the plaintiff has not shown any duty independent of the interrelated contracts and the economic loss rule bars the tort claim and holds the parties to the contracts' terms."); *Grynberg*, 10 P3d at 1270 (II) (ruling that economic loss rule barred plaintiff's tort claims when "all of the actions undertaken . . . were called for in, and governed by, the contracts between the parties").

There is an exception to this rule if "special circumstances" exist, such as where there is a "special relationship between the parties" supporting the imposition of an independent duty of care regardless of the parties' contractual relationship. *Grynberg*, 10 P3d at 1271 (citing cases and giving examples of such relationships, including the attorney-client relationship and physician-patient relationship); *Town of Alma*, 10 P3d at 1263 (citing cases). Additionally, there is a narrow exception for certain common law tort claims, such as fraudulent inducement, that aim to redress fraudulent *pre-contractual* conduct. See *BRW, Inc.*, 99 P3d at 75; *Grynberg v. Questar Pipeline Co.*, 70 P3d 1, 12-13 (Utah 2003).[6]

(a) *Source Of K-C Aviation's Duty To Inspect The Logbooks.* Appellant contends that the source of K-C Aviation's duty to inspect the airplane's logbooks for compliance with service bulletins was the Proposal and Waiver Agreement. We agree. As noted above, Paragraph 3.1 of the Proposal provided that K-C Aviation would "[p]erform a Pre-purchase Records Review including . . . Customer Bulletins and Aircraft Service Changes." Given this provision, it is clear that K-C Aviation's duty to inspect the logbooks for compliance with service bulletins was "called for in, and governed by," the Proposal and any specific limitations placed thereon by the Waiver Agreement attached to the Proposal. *Grynberg*, 10 P3d at 1270. Because the parties bargained over this issue and reached a contractual agreement memorializing their expectations, we conclude that the Utah economic loss rule bars appellees' tort claims predicated on K-C Aviation's logbook review. See *Parr*, 107 P3d at 1108; *BRW, Inc.*, 99 P3d at 74.

Appellees nevertheless argue that the economic loss rule should not apply because even if the duty to inspect the logbooks arose out of the Proposal and Waiver Agreement, neither of those agreements

---

[6] Although the Utah Supreme Court applied Wisconsin law in *Questar Pipeline Co.*, the Court discussed Utah and Colorado cases dealing with the economic loss rule in the course of its analysis. See id. at 12-13.

allegedly set out the standard of care that should apply for determining whether the duty had been breached. Even assuming that the Utah economic loss rule requires the contract to explicitly set out the standard of care applicable to the contractual duty, appellees' argument fails because the Waiver Agreement did so in this case.

On page 1 of the Waiver Agreement, the parties *struck* through a provision stating that

> THE WAIVER OF LIABILITY ... EXPRESSLY INCLUDES LIABILITY AND RESPONSIBILITY FOR DEFECTS, DAMAGES OR OTHER PROBLEMS WITH RESPECT TO THE AIRCRAFT OR ITS COMPONENT PARTS OR ACCESSORIES THAT WERE NOT DISCOVERED BY K-C AVIATION, INC. DURING THE EVALUATION OF THE AIRCRAFT DUE TO ITS OWN NEGLIGENCE. ...

Likewise, in Paragraph 4 on page 2 of the Waiver Agreement, the parties *struck* through a provision stating that appellees "SPECIFICALLY WAIVE[ ] ANY OTHER OBLIGATION OR LIABILITY ON THE PART OF K-C AVIATION OR ITS DIRECTORS, OFFICERS, EMPLOYEES, OR AGENTS, WHETHER EXPRESS OR IMPLIED IN FACT OR BY LAW, OF ANY NATURE WHATSOEVER."

Then, Paragraph 5 of the Waiver Agreement, entitled "Waiver and Indemnification," was *modified* to state:

> It is expressly understood and agreed that in undertaking the evaluations contemplated hereby, K-C Aviation expressly denies any liability or responsibility for undiscovered defects, damages or other problems with the Aircraft or its component parts or accessories whether or not the same should have been discovered by K-C Aviation in the evaluation. ... [T]he undersigned hereby waives any and all rights and causes of action that may arise as a result of the evaluation and any reports or comments of K-C Aviation in connection therewith, whether such right or cause of action be for incidental, special or consequential damages, personal injuries, property damage, repair costs or liabilities of any other kind or nature which the undersigned or its agents, contractors or employees could assert against K-C Aviation, *unless caused by K-C Aviation's negligence.* ...

(Emphasis supplied.) The "unless caused by K-C Aviation's negligence" language was deliberately penciled into the written agreement and initialed by the parties.

Taken together, these modifications to the waiver provisions of the contract reflect that the parties intended for K-C Aviation to be governed by a negligence standard in carrying out its contractual duties, including its duty to inspect the logbooks for compliance with service bulletins. Thus, appellees are incorrect in their contention that the contract did not contain a standard of care governing K-C Aviation's conduct under the contract.[7]

Arguing for a heightened standard of care, K-C Aviation contends that the quoted "unless caused by K-C Aviation's negligence" language should be read as modifying only the second sentence of Paragraph 5, not the first sentence. Under this narrow interpretation, the Waiver Agreement would provide that K-C Aviation could be sued "if there was negligence of a kind unrelated to the failure to discover." Applying Texas law,[8] we reject appellant's interpretation, in light of the other modifications made to the Waiver Agreement discussed above. See *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 SW2d 647, 652 (Tex. 1999) ("When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless.") (citations omitted). Furthermore, any potential ambiguity in the waiver provisions must be interpreted against K-C Aviation. Texas courts have held that provisions attempting to prospectively waive or release a party from liability for its own future negligence must satisfy the "express negligence" test. See *Dresser Indus. v. Page Petroleum*, 853 SW2d 505, 508-509 (Tex. 1993); *Ethyl Corp. v. Daniel Constr. Co.*, 725 SW2d 705, 708 (Tex. 1987). Under the test, a contracting party's intent "must be expressed in unambiguous terms within the four corners of the contract." (Footnote omitted.) *Arthur's Garage v. Racal-Chubb Security Systems*, 997 SW2d 803, 814 (Tex. Ct. App. 1999). That test has not been met in this case.

Finally, appellees argue that there are three independent duties of care that exist separate and apart from their contract with K-C

---

[7] We likewise reject appellees' contention in a single sentence of their appellate brief that the modifications to the Waiver Agreement reflect that the parties intended to contract around the economic loss rule and allow appellees to sue *in tort* if K-C Aviation negligently reviewed the airplane logbooks. As modified, Paragraph 5 provided no more than that appellees waived any "causes of action that *may* arise . . . unless caused by K-C Aviation's negligence." (Emphasis supplied.) By its plain language, the modified provision simply stated that to the extent appellees otherwise had any causes of action under applicable law, those causes of action were not waived if K-C Aviation was negligent. The modification clearly did not purport to affirmatively create or resurrect causes of action that would not be available in the first instance under applicable law.

[8] As previously noted, the trial court ruled that Texas law would govern the waiver provisions, and neither party has contested that ruling on appeal.

Aviation that support allowing them to go forward with their tort claim for negligent inspection of the logbooks. Appellees' argument is misplaced.

> [Even if a party has] an independent, well-recognized obligation imposed by tort law . . . , the existence of such a duty is not determinative, because [courts] are directed *first* to determine whether the contract requires conformance to a particular standard before turning to an independent duty analysis. If a duty is found in the contract, as here, it is improper further to analyze the existence of an independent tort duty in determining whether an economic loss may be recovered.

(Citation omitted; emphasis in original.) *Parr*, 107 P3d at 1108. See also *Tuchman v. Pell Rudman Trust Co.*, 245 FSupp.2d 1156, 1159-1160 (D. Colo. 2003) (applying Colorado law and holding that even if a duty of care would otherwise be imposed upon the defendant by tort law, if the duty is the same as or has been subsumed under the duties set forth in the parties' contract, then the duty of care imposed in tort is no longer "independent" for purposes of the economic loss rule).

Nor have appellees pointed to a special relationship between the parties or other "special circumstances" justifying an independent tort action. See *Grynberg*, 10 P3d at 1271; *Town of Alma*, 10 P3d at 1263. While appellees rely upon *A. C. Excavating v. Yacht Club II Homeowners Assn.*, 114 P3d 862, 865-870 (Colo. 2005), that case arose in the unique context of home construction, where, as the Colorado Supreme Court emphasized, there was an extensive history of the Colorado courts imposing a tort duty to construct homes without negligence, independent of any contractual obligations. Id. at 866-870. *A. C. Excavating* did not purport to announce a new rule for cases arising outside that unique context, and we decline to do so here.[9]

---

[9] The trial court relied on *Hermansen*, 48 P3d 235, and *Tallman v. City of Hurricane*, 985 P2d 892 (Utah 1999) to support its conclusion that an independent tort duty existed in this case. However, neither of those cases involved a plaintiff claiming that the defendant had failed to carry out a duty that also was imposed upon the defendant in a contract between the parties or their privies. See *Hermansen*, 48 P3d at 240 (noting that plaintiffs were not alleging that defendants "owed them duties arising from a contract" and distinguishing case from one "where all respective rights of the parties are negotiated and risk appropriately designated in a written instrument"); *Tallman*, 985 P2d at 894 (concluding that employee of general contractor personally injured in trench accident was owed independent tort duty by subcontractor that dug the trench; no contractual duty was imposed upon subcontractor to ensure that trench was safe). Furthermore, *Tallman* involved a plaintiff who suffered physical injury rather than "economic loss." See id. Consequently, the trial court erred in relying on these cases.

Additionally, appellees have not alleged a tort claim for fraudulent inducement or other similar tort aimed at redressing precontractual conduct that potentially could provide a basis for an independent tort claim. Compare *Keller v. A. O. Smith Harvestore Products, Inc.*, 819 P2d 69, 72 (II) (1) (Colo. 1991) (en banc) (holding that "a contracting party's negligent misrepresentation of material facts *prior to the execution of [the] agreement* may provide the basis for an independent tort claim") (emphasis supplied), with *BRW, Inc.*, 99 P3d at 75 (holding that negligent misrepresentation claim was barred under economic loss doctrine when the duty to report was contained in the parties' contract); *Scott Co. of California v. MK-Ferguson Co.*, 832 P2d 1000, 1005 (Colo. Ct. App. 1992) (same). It follows that no exceptions to the Utah economic loss rule apply in the instant action.

For these reasons, the Utah economic loss doctrine bars appellees' tort claims predicated on the alleged negligent logbook review performed by K-C Aviation. The trial court erred by failing to grant summary judgment to appellant.

(b) *Source Of Gulfstream Appleton's Duty To Inspect The Logbooks.* Appellant argues that the source of Gulfstream Appleton's duty to inspect the logbooks likewise arose out of the contract between the parties. However, the Work Authorization governing the work done by Gulfstream Appleton does not mention or refer to any review of the airplane's logbooks that would be conducted. Thus, the Work Authorization is not the source of any duty to inspect the logbooks owed by Gulfstream Appleton; to the extent that Gulfstream Appleton undertook such an inspection, it fell outside the scope of the parties' contractual agreement. As such, we conclude that the Utah economic loss doctrine does not bar appellees' tort claims predicated on Gulfstream Appleton's logbook inspection, since the duty to inspect was not called for in, or governed by, the contractual agreement between the parties. Compare *Cooley v. Big Horn Harvestore Systems*, 813 P2d 736, 749 (IV) (A) (Colo. 1991) (en banc) (holding that negligence claim was not barred when defendant's duty "[was] not governed by the purchase agreement" between the parties), with *Grynberg*, 10 P3d at 1270 (distinguishing *Cooley* on ground that in the present case, "[r]espondents undertook to provide no services outside the scope of their contractual duties" and "did not provide any services . . . that they were not already required to provide by the terms of the contracts").

Nevertheless, appellant contends that even if the economic loss rule does not apply, appellees' tort claims should have been dismissed because there was no duty of care imposed upon Gulfstream Appleton to inspect the logbooks for compliance with ASCs, the type of service

bulletin central to this case. We disagree. "Utah, like most jurisdictions, has recognized that one who undertakes to render services has a duty to exercise reasonable care." (Footnote omitted.) *Weber v. Springville City*, 725 P2d 1360, 1364 (III) (Utah 1986). "Where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care." (Citation and punctuation omitted.) *Nelson ex rel. Stuckman v. Salt Lake City*, 919 P2d 568, 573 (III) (A) (Utah 1996). See also *Atkinson v. Stateline Hotel Casino & Resort*, 21 P3d 667, 671 (Utah Ct. App. 2001) (noting that Utah has adopted Restatement (Second) of Torts § 323 (1965)). Because there is evidence that Gulfstream Appleton undertook a review of the airplane's logbooks for compliance with ASCs, we conclude that appellees have established a duty of care upon Gulfstream Appleton providing a basis for their tort claims.[10]

It is true that the invoice Gulfstream Appleton prepared after completing its repair and inspection work reflects that it "performed AD & CB research" but mentions nothing about whether it also undertook a review of the airplane's logbooks for compliance with ASCs. But, appellees point to another document in the record entitled "Aircraft Services Changes Research List," which is a chart listing over 30 ASCs (including ASC 372) with handwritten notations as to whether and when there had been compliance with each ASC.

There is no explicit reference to Gulfstream Appleton anywhere on the Research List, and appellant emphasizes that the date printed on the Research List is "4/18/97," before the logbook review undertaken by Gulfstream Appleton. However, in opposing summary judgment, appellees submitted an affidavit averring that the Research List was produced by Gulfstream Appleton as part of discovery in this lawsuit. Appellees also submitted the invoice prepared by Gulfstream Appleton as part of its 1998 inspection work, which listed the relevant job number as "13120" and the number of airplane landings at the time of the inspection as "2769." The same job number and number of landings appear on the Research List. Furthermore, appellees assert that the date printed on the Research List reflects the date upon which the *blank chart itself* was last revised, rather than when the Research List was filled in with information concerning compliance with ASCs. In support of this assertion, appellees point to a separate research list produced by Gulfstream Appleton charting compliance with CBs that has a date printed on it of

---

[10] Our opinion in no way resolves whether appellees can satisfy the other elements of their tort claims, which are not at issue in this appeal.

"11/17/98," but which contains handwritten notations of compliance dates that come *after* that printed date.

This combined circumstantial evidence, construed in the light most favorable to appellees (the parties opposing summary judgment), creates a genuine issue of material fact over whether the Research List was filled in by Gulfstream Appleton as part of its logbook review in 1998. See *Salinas v. Skelton*, 249 Ga. App. 217, 220-221 (1) (547 SE2d 289) (2001) (party can make out prima facie case that document is an authentic business record of the opposing party based on production of the document by the opposing party, combined with other circumstantial evidence, such as the appearance and content of the document); *Davis v. First Healthcare Corp.*, 234 Ga. App. 744, 747 (1) (507 SE2d 563) (1998) (same). As such, a reasonable factfinder could conclude that Gulfstream Appleton undertook a review of the airplane's logbooks for compliance with ASCs (including ASC 372). And, once it undertook such a review, Gulfstream Appleton was obligated to exercise reasonable care under Utah tort law. See *Atkinson*, 21 P3d at 671; *Nelson ex rel. Stuckman*, 919 P2d at 573. Accordingly, the trial court correctly denied summary judgment on appellees' tort claims predicated on the logbook inspection by Gulfstream Appleton.

For these reasons, we conclude that appellees' tort claims predicated on the logbook review by K-C Aviation were barred by the Utah economic loss doctrine, and, therefore, that the trial court erred in denying summary judgment to appellant on those claims. In contrast, we conclude that the trial court correctly denied summary judgment on appellees' tort claims predicated on the logbook review by Gulfstream Appleton, since those claims were not barred by the Utah economic loss doctrine, and the evidence construed most favorably to appellees supports imposing a tort duty of reasonable care upon Gulfstream Appleton.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Barnes, J., concur.*

DECIDED JULY 27, 2006.

*Savage, Herndon & Turner, Brent J. Savage, Christopher D. Britt*, for appellant.

*Clark & Clark, Fred S. Clark*, for appellees.