IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Frank E. Berrett, | ) | OPINION |
| | ) | |
| Plaintiff and Appellant, | ) | Case No. 20110233-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Albertsons Incorporated, | ) | (December 28, 2012) |
| | ) | |
| Defendant and Appellee. | ) | 2012 UT App 371 |

-----

Third District, Salt Lake Department, 060904093
The Honorable Kate A. Toomey

Attorneys:     Roger P. Christensen, L. Rich Humpherys, and Karra J. Porter, Salt Lake
               City, for Appellant
               Mitchel T. Rice, Todd C. Hilbig, and Stephen F. Edwards, Salt Lake
               City, for Appellee

-----

Before Judges Orme, Thorne, and Voros.

VOROS, Judge:

¶1     This is an appeal from a grant of summary judgment. The case involves a
personal injury claim originally brought by Irene B. Berrett and her husband, Frank E.
Berrett, and later continued by Frank Berrett on behalf of himself, Irene Berrett's heirs,
and the Estate of Irene B. Berrett (collectively, the Berretts). Irene Berrett was injured
when she fell twenty feet into an open manhole while walking to her car in an
Albertsons parking lot in Draper, Utah. The trial court granted summary judgment in
favor of Albertsons. We affirm in part, reverse in part, and remand.

BACKGROUND[1]

¶2    On the morning of January 17, 2006, Irene Berrett drove into the Albertsons parking lot in the Hidden Valley Shopping Center on Draper Parkway. Near her parking stall was a manhole. When she arrived, the manhole was attended by Austin Miner, an employee of A-1 Septic Tank Services. Albertsons had hired A-1 to service a grease trap located approximately twenty feet below the surface of the parking lot. That morning, Miner had parked his septic tank truck six to ten feet from the manhole. He removed the manhole cover and inserted into the manhole a hose attached to the tank of the A-1 truck.

¶3    After visiting another business in the shopping center, Irene Berrett returned to the parking lot. While walking toward her vehicle, Irene Berrett fell into the open shaft. Surveillance video of the parking lot shows a shadow move toward the open manhole, then abruptly disappear.[2] When Irene Berrett fell into the open manhole, the hose was no longer inside the manhole but on the ground next to it, and Miner was away from the spot with his back turned. The Berretts allege that Miner had been away from the manhole for four or more minutes before she fell.[3]

---

[1]When reviewing a grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to . . . the nonmoving party. Accordingly, we recount the facts in the light most favorable" to the Berretts. *See Magana v. Dave Roth Constr.*, 2009 UT 45, ¶ 5, 215 P.3d 143 (citation and internal quotation marks omitted).

[2]Due to the positioning and angle of the surveillance camera, the video does not capture the parked A-1 truck or the manhole itself. The video does, however, capture a portion of the parking lot on one side of the manhole. Possibly due to the camera angle, Miner can be seen in the video at some times but not others. The parties dispute whether Miner's absence at various points in the video is because he had moved slightly out of the frame or because he had moved away from the manhole itself and was no longer attending it.

[3]The parties dispute how often and for how long Miner was away from the manhole that morning, including at the critical moment. Based on Miner's testimony,

(continued...)

¶4     Miner noticed car keys lying on the ground near the manhole. Walking toward the keys, he heard cries for help coming from inside the manhole. Miner looked in and discovered Irene Berrett. She had fallen twenty feet into the uncovered manhole. A rescue team required an hour and a half to extract her. She was seriously injured.

¶5     Albertsons maintains grease traps at most of its grocery stores. Water from the store's bakery, sometimes reaching two hundred degrees, discharges into the trap. The trap must be serviced about every six weeks. At the Draper Parkway store, where Irene Berrett fell, the grease trap is located in front of the store in its main parking lot, a few feet from the shopping cart return, and directly in line with a crosswalk leading from the front doors of the store to the parking stall where Irene Berrett parked her car.

¶6     A-1 had cleaned the grease trap at the Draper Parkway store many times before Irene Berrett's accident. That morning, Miner was following his usual procedure. Albertsons was aware that this would include removing the manhole cover and leaving it uncovered during servicing. At least two Albertsons employees—the lobby supervisor and a checker—observed Miner servicing the grease trap that morning. The checker saw cars parked near the manhole while the cover was off, and Miner stated that "dozens of people" walked in and out of the parking lot past the open manhole. Neither Miner nor Albertsons placed any barricades around the manhole.

¶7     Albertsons had no written contract with its independent contractor, A-1. Albertsons did not dictate the method for servicing the grease trap, direct A-1 on the frequency of its visits or how to barricade or isolate its work, provide training or instruction on safety or customer interactions, or otherwise supervise, assist, or direct A-1's work. However, Miner testified that, had Albertsons instructed A-1 to take safety precautions when servicing its grease trap, A-1 would have complied.

---

[3](...continued)
operation of the equipment he used to do the job took him away from the manhole for at least seconds at a time to perform tasks such as opening and closing the valve on the truck. Albertsons claims that "[n]o more than five or six seconds elapsed while [Miner] had his back turned" to the manhole and left the spot. The Barretts rely on the surveillance video, which is open to differing interpretations due to the positioning and angle of the camera.

¶8      The Berretts sued Albertsons and A-1 for damages, alleging negligence and premises liability. At completion of discovery, Albertsons moved for summary judgment on the ground that it owed Irene Berrett no duty. The trial court granted the motion. The Berretts moved for reconsideration, arguing that the supreme court's decision in *Magana v. Dave Roth Construction*, 2009 UT 45, 215 P.3d 143, issued after the trial court's order, undercut the rationale for the grant of summary judgment. The trial court denied the Berretts' motion. The Berretts appealed.

¶9      Meanwhile, the Berretts continued to pursue their remaining claims against co-defendant A-1. Less than a week before trial was set to begin, Irene Berrett died of causes unrelated to the accident. Frank Berrett amended the pleadings to assert a wrongful death claim on behalf of Irene Berrett's heirs and a survival action on behalf of her estate, implicating Utah's survival statute, *see generally* Utah Code Ann. § 78-11-12 (LexisNexis 2002) (current version at *id.* § 78B-3-107 (2012)). The Berretts prevailed at trial, settled with A-1 while post-trial motions were pending, and dismissed their claims against A-1.

¶10      The Berretts now appeal both the trial court's grant of summary judgment in favor of Albertsons and a ruling of the trial court that the survival statute in effect at the time of the injury applies.


ISSUES AND STANDARDS OF REVIEW


¶11      On summary judgment, the trial court ruled that Albertsons owed Irene Berrett no duty of care. The Berretts challenge this ruling on two grounds. First, they contend that they have demonstrated facts showing that Albertsons had actual or constructive notice of a hazardous condition, and thus owed a duty to Irene Berrett as a business invitee. Second, they contend that Albertsons owed a duty to Irene Berrett under the doctrine of peculiar risk as described in section 413 of the Restatement (Second) of Torts. *See* Restatement (Second) of Torts § 413 (1965).

¶12      Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and

all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted). Whether a legal duty exists is a question of law for the court. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

¶13    In addition, the Berretts challenge the trial court's ruling that the version of the survival statute in effect at the time of Irene Berrett's accident, not the version in effect at the time of her death, controls. This challenge presents a question of statutory interpretation. *See In re T.M.*, 2003 UT App 191, ¶ 9, 73 P.3d 959 ("Determining which version of [a] statute applie[s] is a matter of statutory interpretation . . . ." (second alteration in original) (citation and internal quotation marks omitted)). We therefore review the trial court's ruling for correctness. *See Berneau v. Martino,* 2009 UT 87, ¶ 9, 223 P.3d 1128.


ANALYSIS

1. Genuine Issues of Material Fact Preclude Summary Judgment.

¶14    The trial court concluded that Albertsons was, as a matter of law, not vicariously liable for the acts of A-1 and that the evidence and the law do not support the Berretts' contention that Albertsons was directly negligent. "[W]ithout a duty, there can be no negligence as a matter of law, and summary judgment is appropriate." *Tallman v. City of Hurricane*, 1999 UT 55, ¶ 5, 985 P.2d 892 (citation and internal quotation marks omitted). However, if Albertsons owed Irene Berrett "a duty under any [pleaded] legal theory, and there are disputed facts as to whether that duty was breached," then we must reverse the trial court's grant of summary judgment for Albertsons. *See id.* The Berretts alleged direct liability based on premises liability and contend that the record contains evidence from which a jury could have found Albertsons liable under this theory.

¶15    This case involves a business owner, Albertsons, which employed an independent contractor to perform work on its premises. The trial court stated that A-1 was attending the manhole at the time of the accident and that Utah law does not impose a duty on Albertsons to do what its independent contractor was already doing. *See Thompson v. Jess*, 1999 UT 22, ¶ 13, 979 P.2d 322 ("'[T]he employer of an independent

contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.'" (quoting Restatement (Second) of Torts § 409 (1965))).

¶16    An employer is generally not vicariously liable for the acts and omissions of its independent contractors, but it remains directly liable for its own actions. *See Magana v. Dave Roth Constr.*, 2009 UT 45, ¶¶ 22–23, 36–37, 215 P.3d 143; *Gonzalez v. Russell Sorensen Constr.*, 2012 UT App 154, ¶ 18, 279 P.3d 422. Here, the Berretts allege direct—not vicarious—liability. They contend that the open manhole posed a temporary hazard, that Albertsons had notice of the hazard, and that Albertsons therefore had a duty to act reasonably to mitigate the harm to Irene Berrett as a business invitee. In general, "property owners are not insurers of the safety of those who come upon their property, even though they are business invitees." *Martin v. Safeway Stores, Inc.*, 565 P.2d 1139, 1140 (Utah 1977). But a business owner has "'a nondelegable duty to keep the premises reasonably safe for business invitees.'" *Price v. Smith's Food & Drug Cntrs., Inc.*, 2011 UT App 66, ¶ 26, 252 P.3d 365 (quoting *Sullivan v. Utah Gas Serv. Co.*, 353 P.2d 465, 466 (Utah 1960)); *see also Jex v. JRA, Inc.*, 2008 UT 67, ¶ 25, 196 P.3d 576 (holding that a business owner has a duty to use reasonable care to maintain premises in a reasonably safe condition for patrons).

¶17    "Premises liability cases generally fall into two classes: those involving temporary conditions and those involving permanent conditions." *Price*, 2011 UT App 66, ¶ 9 (citing *Allen v. Federated Dairy Farms, Inc.*, 538 P.2d 175, 176 (Utah 1975)). The Berretts have alleged a temporary unsafe condition theory of liability. Under this theory, a litigant must prove "that (1) the defendant had . . . either actual knowledge or constructive knowledge [of the condition] because the condition had existed long enough that he should have discovered it; and (2) after [obtaining] such knowledge, sufficient time elapsed that in the exercise of reasonable care he should have remedied it." *Jex*, 2008 UT 67, ¶ 16 (second alteration in original) (citation and internal quotation marks omitted). Therefore, Albertsons owed a duty of care to Irene Berrett if Albertsons was on actual or constructive notice of the temporary hazard created by the open manhole and had sufficient time to remedy it.

¶18    The Berretts assert that "there was sufficient evidence in the record from which a jury could have found" that Albertsons was on either actual or "at least constructive notice of the hazardous condition, i.e., the open, unmarked, unbarricaded manhole." Albertsons responds first that the Berretts "failed to provide any evidence of actual

notice." They argue that "no testimony was elicited from any employee that Albertsons observed the open manhole unattended, or the A-1 employee not sufficiently close to the open manhole, or the employee acting inattentively." Second, Albertsons responds that the Berretts failed to show that Albertsons "had constructive notice of the open and unattended manhole." According to Albertsons, "constructive notice cannot possibly be found" because "the only available evidence is that [the A-1 employee] left the open manhole unattended when Albertsons was not present" for a period of time too brief to establish constructive notice. In denying the Berretts' request for reconsideration of the grant of summary judgment, the trial court stated, "[The Berretts] have not pointed to any evidence that any employee of Albertsons saw the manhole open and unattended. In other words, there is no evidence that Albertsons had knowledge of a dangerous condition on its premises."

¶19    To establish that Albertsons had actual knowledge of a temporary condition, the Berretts must present evidence that A-1's servicing of the grease trap—e.g., the open manhole in the busy parking lot—presented a hazard of which Albertsons had actual knowledge and sufficient time to take precautionary measures. *See Jex,* 2008 UT 67, ¶ 16. "To establish that a temporary condition existed long enough to give [Albertsons] constructive notice of it, [the Berretts] must present evidence that would show . . . that [the condition] had been there for an appreciable time." *See id.* ¶ 19 (omission in original) (citation and internal quotation marks omitted). An appreciable time is a period "'capable of being perceived and recognized or of being weighed and appraised.'" *Price,* 2011 UT App 66, ¶ 12 n.2 (citation omitted). "Our courts have thus 'imputed constructive notice to a store owner only when there is *some evidence* of the length of time the [condition has existed].'" *Id.* ¶ 12 (emphasis added) (quoting *Jex,* 2008 UT 67, ¶ 19). However, where "conjecture and speculation [are] the only way[s] to determine the length of time [the condition has existed]," the court should not impute constructive notice. *Jex,* 2008 UT 67, ¶ 21 (citation and internal quotation marks omitted).

¶20    In *Price v. Smith's Food & Drug Centers, Inc.,* 2011 UT App 66, 252 P.3d 365, this court held that a plaintiff had presented sufficient evidence that a grocery store had constructive notice of a hazard when the plaintiff slipped in a puddle of water on the grocery store floor near where an independent food vendor had been providing free food samples a short time earlier. *See id.* ¶¶ 2, 17. We concluded that the plaintiff had met the "relatively lenient [appreciable time] standard" because she "ha[d] adduced

some evidence that the water may have been on the floor for some ten to twenty-two minutes," *id.* ¶ 17, based on a combination of witness testimony and floor inspection logs, *see id.* ¶ 14. Similarly, in *Ohlson v. Safeway Stores, Inc.*, 568 P.2d 753 (Utah 1977), the supreme court concluded that a plaintiff presented sufficient evidence of constructive knowledge of spaghetti spilled on the floor because it "was dirty, crushed, broken into small pieces, and . . . extended from aisle ten around the end of that aisle into the main aisle for five or six feet toward the cash register at the front of the store." *Id.* at 754.

¶21     On the other hand, in *Jex v. JRA, Inc.*, 2008 UT 67, 196 P.3d 576, our supreme court held that the plaintiff's evidence was not sufficient to show constructive notice. In *Jex,* the plaintiff slipped on a puddle of water in a store. *See id.* ¶ 1. The plaintiff relied on the fact that the store's employees had shoveled snow the morning of the accident and wore boots with deep treads, arguing that the employees were therefore likely to have tracked snow into the store, creating the puddle. *See id.* ¶ 21. The court concluded that although the plaintiff's arguments "[bore] upon who created the puddle, they [did] little to establish how long it had been there." *Id.*

¶22     Drawing all inferences in favor of the Berretts, *see Price,* 2011 UT App 66, ¶ 17, we conclude that the Berretts have adduced some evidence suggesting that Albertsons had notice of the hazard and thus owed Irene Berrett a duty of care, *see Jex,* 2008 UT 67, ¶ 19 (stating that courts impute constructive notice where there is "some evidence of the length of time" the condition existed). The Berretts point to record evidence that Albertsons had actual notice of the hazard. For example, when A-1 was first hired (prior to the date of the accident), an Albertsons store manager accompanied an A-1 employee out to the manhole to visually inspect it, and thus knew that the job would require that the manhole be left open. In addition, multiple Albertsons employees witnessed A-1 present in the parking lot the day of the accident with an open manhole. And at least one witness, unaffiliated with Albertsons, testified that she had seen A-1 servicing the manhole that day and on prior occasions, but never saw any barricades at or near the manhole. A jury might reasonably infer that, taken together, these facts establish that Albertsons had actual notice of the hazard.

¶23     In addition, the Berretts presented some evidence on which a jury could find that any hazard posed by the open manhole existed for an "appreciable time" sufficient to give Albertsons constructive notice of the risk A-1's servicing procedures would pose to customers in the parking lot. *See Jex,* 2008 UT 67, ¶ 19; *Price,* 2011 UT App 66, ¶¶ 15–16.

For example, on the day of the accident Miner arrived at the Draper Parkway Albertsons between roughly 10:00 and 10:15 a.m. A-1 was still servicing the open manhole at 10:47 a.m. when the accident occurred. In the interim, "dozens of people . . . walk[ed] in and out past [Miner]," including at least two Albertsons employees. The Berretts rely on surveillance video footage and eye witness testimony to establish the time frame. The Berretts also point to surveillance video that they claim shows Miner away from the manhole for minutes at a time in the half hour leading up to the accident (an account that Albertsons disputes).

¶24     "[B]ecause negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, summary judgment is appropriate in negligence cases only in the clearest instances." *Matheson v. Marbec Invs., LLC*, 2007 UT App 363, ¶ 5, 173 P.3d 199 (citation and internal quotation marks omitted). The Berretts have alleged facts from which a jury might (or might not) conclude that Albertsons knew or was on notice of a hazard to its business invitees. The trial court thus erred as a matter of law in granting summary judgment in favor of Albertsons.

2. Section 413 of the Restatement (Second) of Torts Applies.

¶25     The Berretts next contend that the trial court erred by declining to apply the principles described in section 413 of the Restatement (Second) of Torts, commonly known as the peculiar risk doctrine. *See Thompson v. Jess*, 1999 UT 22, ¶ 27, 979 P.2d 322. The Berretts contend that Albertsons had a duty to take steps to ensure that A-1, as its contractor, employed special precautions because the work A-1 was hired to perform involved a peculiar unreasonable risk of physical harm absent such precautions. *See* Restatement (Second) of Torts § 413 (1965).

¶26     Section 413 describes a duty on the part of the employer when the employer entrusts to an independent contractor work that is likely to create a peculiar unreasonable risk of harm when certain circumstances apply:

> One who employs an independent contractor to do work
> which the employer should recognize as likely to create,
> during its progress, a peculiar unreasonable risk of physical
> harm to others unless special precautions are taken, is

subject to liability for physical harm caused to them by the
absence of such precautions if the employer

> (a) fails to provide in the contract that the contractor
shall take such precautions, or

> (b) fails to exercise reasonable care to provide in some
other manner for the taking of such precautions.

*Id.*

¶27 According to the Berretts, servicing the grease trap presented a peculiar risk because of the nature of the job (removing a manhole cover that exposed a twenty-foot drop) and its location in a busy area of a parking lot. "Knowing [these circumstances existed], Albertsons had only to provide in a contract with A-1 that A-1 would take . . . precautions" to minimize the risk to third parties. Albertsons responds that no duty as described in section 413 presently exists under Utah law, and that "such a duty would be contrary to the general rule in Utah that an employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." In addition, Albertsons maintains that "[a]doption of section 413 would . . . greatly change the relationship between employer and contractor in numerous instances" and "would burden employers with obtaining knowledge, often in very foreign fields of work, in order to assess and select the special precautions that must be undertaken before the contractor is permitted to proceed with its work."

¶28 The trial court declined to apply section 413 on the ground that it has not been adopted in Utah and that it would "defeat or severely limit" the well-established common law rule of nonliability for physical harm caused by an act or omission of an independent contractor.

¶29 The general rule of nonliability on the part of an employer for acts or omissions of its independent contractor "recognizes that one who hires an independent contractor and does not participate in or control the manner in which the contractor's work is performed owes no duty of care concerning the safety of the manner or method of performance implemented." *Thompson,* 1999 UT 22, ¶ 13 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 509 (5th ed. 1984)). This rule is based on the principle that "where the . . . employer does not control the means of accomplishing the contracted work, the contractor is the proper party to be charged with the responsibility

for preventing the risk [arising out of the work]" and managing it accordingly. *Id.* (alteration in original) (citation and internal quotation marks omitted). However, "the doctrine is limited to circumstances where the plaintiff alleges that the employer of a contractor is liable for the *contractor's negligence* because the employer retained sufficient control over the contractor's actions to owe the plaintiff a duty of care regarding the contractor's actions." *Magana v. Dave Roth Constr.*, 2009 UT 45, ¶ 37, 215 P.3d 143. "The rule does not speak to an employer's liability for its own actions." *Id.*; *see also Gonzalez v. Russell Sorensen Constr.*, 2012 UT App 154, ¶ 18, 279 P.3d 422.

¶30　The Restatement (Second) of Torts outlines several limits to the general rule of nonliability. One of these is the peculiar risk doctrine of section 413. That rule "reflect[s] special situations where the employer is in the best position to identify, minimize, and administer the risks involved in the contractor's activities." *Wilson v. Good Humor*, 757 F.2d 1293, 1301 (D.C. Cir. 1985) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 509–10 (5th ed. 1984)). This doctrine would impose direct liability on an employer of an independent contractor under narrow circumstances in which the employer "has reason to know that the independent contractor's work is likely to create a peculiar risk to others absent special precautions" and the employer "takes no steps to minimize that risk by contract or otherwise." *Id.* at 1304 (applying section 413). A peculiar risk is "a risk 'peculiar to the work to be done, and arising out of its character, or out of the place where it is to be done, against which a reasonable person would recognize the necessity of taking special precautions.'" *Id.* at 1304–05 (emphasis and brackets omitted) (quoting Restatement (Second) of Torts § 413, cmt. b (1965)). "Section 413 is premised on direct liability for a principal employer's negligence in failing to insure that special precautions are taken in the contractor's work." *Thompson*, 1999 UT 22, ¶ 28.

¶31　Albertsons correctly notes that no Utah court has expressly adopted the peculiar risk doctrine. At least three times Utah courts have been presented with the peculiar risk doctrine or its variant, the "inherently dangerous work" doctrine, *see* Restatement (Second) of Torts §§ 416, 427, 427A (1965). Each time the appeal was resolved on other grounds. *See Poteet v. White,* 2006 UT 63, ¶ 8, 147 P.3d 439 (declining to consider adopting the inherently dangerous work doctrine "because it is unnecessary to our resolution of the case"); *Thompson,* 1999 UT 22, ¶ 33 (holding that the peculiar risk doctrine has no application to employees of independent contractors whose claims fall within the workers' compensation system); *Johnson v. Department of Transp.,* 2004 UT

App 284, ¶ 11 n.3, 98 P.3d 773 (declining to address the peculiar risk and inherently dangerous work doctrines because of its resolution of the case under the issues of delegability and retained control).

¶32     Nevertheless, the supreme court's discussion of peculiar risk in *Thompson v. Jess*, 1999 UT 22, 979 P.2d 322 is instructive. There, a contractor's employee sued a landowner for injuries he suffered while installing a large pipe on her property. *See id.* ¶¶ 3–7. The employee urged the court to adopt the doctrine of peculiar risk embodied in sections 413, 416, and 427 of the Restatement.[4]

¶33     Our supreme court acknowledged the general rule that "one who hires an independent contractor and does not participate in or control the manner in which the contractor's work is performed owes no duty of care concerning the safety of the manner or method of performance implemented." *Id.* ¶ 13. The court did not, as Albertsons does, describe the peculiar risk and inherently dangerous work doctrines as "contrary to" or "inconsistent with" this general rule; rather, the court described them as "exceptions" to the general rule. *Id.* ¶ 14. And it discussed them at some length.

¶34     The court explained that the purpose of these sections of the Restatement "is 'to ensure that innocent third parties injured by the negligence of an independent contractor hired by a landowner to do inherently dangerous work on the land would not have to depend on the contractor's solvency in order to receive compensation for the injuries.'" *Id.* ¶ 29 (quoting *Privette v. Superior Court*, 854 P.2d 721, 725 (Cal. 1993) (en banc)). However, the court stated, "this purpose is not advanced when these exceptions are applied in favor of a contractor's employees who are covered by workers' compensation." *Id.* Accordingly, the court "decline[d] to apply sections 413, 416, or 427 of the Restatement *in the manner Thompson propose[d]*," i.e., to an employee of the contractor. *Id.* ¶ 30 (emphasis added). Tellingly, the court noted that "sections 413, 416, and 427 each speak of liability for injury 'to others,' which implies third parties rather

---

[4]Section 413 refers to an employer's direct liability, whereas sections 416 and 427 refer to an employer's vicarious liability. However, "[t]he distinction between section 413 as a direct liability rule and sections 416 and 427 as vicarious liability rules is difficult to grasp . . . ." *San Juan v. PSC Industrial Outsourcing*, 240 P.3d 1026, 1030 n.6 (Nev. 2010). Sections 416 and 427 are not at issue in this appeal and we express no opinion on them.

than employees of the independent contractor carrying out the contracted work." *Id.* ¶ 32.

¶35 We see in *Thompson* no hostility to sections 413, 416, and 427 of the Restatement in principle. The court did not suggest that these sections conflict with Utah law; rather, it held that, by their own terms, they do not apply where a claim falls under the workers' compensation system. And the court did not describe them as inconsistent with Utah's general rule of nonliability for employers, but rather as "exceptions" to it.

¶36 Moreover, the *Thompson* court repeatedly cited with approval the California Supreme Court's opinion in *Privette v. Superior Court*, 854 P.2d 721 (Cal. 1993). While affirming the doctrine of peculiar risk generally, *Privette* held that the doctrine did not extend to an "on-the-job injury to an employee of an independent contractor." *Id.* at 730.[5] Although *Privette* ultimately limited the reach of the peculiar risk doctrine, it explained at some length the historical roots of the doctrine, which developed as a hedge against risk-shifting:

> The origins of this doctrine can be traced to roughly the latter half of the nineteenth century, when a growing recognition developed in the courts that a landowner who chose to undertake inherently dangerous activity on his land should not escape liability for injuries to others simply by hiring an independent contractor to do the work. As a leading English decision from 1876 put it: "[A] man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise . . . cannot relieve himself of his responsibility by employing some one else . . . ."

*Id.* at 724 (alteration and omissions in original) (quoting *Bower v. Peate* (1876) 1 Q.B.D. 321, 326). In the passage directly following a sentence quoted by the Utah Supreme

---

[5]Although *Privette* specifically involved section 416, the California Supreme Court has since clarified that its holding in *Privette* bars recovery by an independent contractor's employees under section 413 as well as section 416. *See Toland v. Sunland Housing Grp., Inc.*, 955 P.2d 504, 506 (Cal. 1998).

Court in *Thompson* , the California Supreme Court emphasized that the historical purpose of the doctrine was to more fairly allocate risk:

> It was believed that as between two parties innocent of any personal wrongdoing—the person who contracted for the work and the hapless victim of the contractor's negligence—the risk of loss occasioned by the contracted work was more fairly allocated to the person for whose benefit the job was undertaken. Also, by spreading the risk of loss to the person who primarily benefited from the hired work, the courts sought to promote workplace safety, a concern of great significance to the public.

*Id.* at 725 (citations omitted).[6] *See also Ortiz v. Ra-El Dev. Corp.*, 528 A.2d 1355, 1357–58 (Pa. Super. 1987) (stating rationale for "special danger" or "peculiar risk" doctrine).

¶37     In sum, our supreme court in *Thompson* did not reject section 413, but distinguished it based on the wording of the section itself. Moreover, in so doing, it quoted approvingly from the California Supreme Court's decision in *Privette* describing the rationale for the rule. In delving further into *Privette*, we find additional persuasive descriptions of the rationale and origin for the peculiar risk doctrine. In light of the foregoing, we conclude that the principles set forth in section 413 are part of Utah's common law of negligence.

¶38     Albertsons warns that "section 413 would burden employers with obtaining knowledge, often in very foreign fields of work, in order to assess and select the special precautions that must be undertaken before the contractor is permitted to proceed with its work." We do not read section 413 so broadly. It creates a duty only when an employer hires a contractor "to do work which the employer should recognize as likely

---

[6]The California court also explained the limits of the doctrine under California law. For example, "the person who hired the contractor will not be liable for injury to others if the injury results from the contractor's 'collateral' or 'casual' negligence." *Privette v. Superior Court*, 854 P.2d 721, 726 (Cal. 1993) (citations omitted). In addition, "[a] person held liable under the doctrine of peculiar risk is entitled to equitable indemnity from the independent contractor at fault for the injury." *Id.* at 725.

to create . . . a peculiar unreasonable risk of physical harm to others unless special precautions are taken . . . ." Restatement (Second) of Torts § 413 (1965). In making this determination, "the extent of the employer's knowledge and experience in the field of work to be done is to be taken into account." *Id.* cmt. f. For example, an inexperienced individual "employing a contractor to build a house is not to be expected to have the same information, or to make the same inquiries . . . as is a real estate development company employing a contractor to build the same house." *Id.*

¶39    Finally, Albertsons maintains that even under section 413, "Albertsons would still not be held liable because an employer cannot be held liable for an independent contractor's failure to take routine precautions." That may be so. But whether the present case involved a risk requiring only "routine precautions, of a kind which any careful contractor could reasonably be expected to take," or a risk that poses "a special danger to those in the vicinity, arising out of the particular situation created," Restatement (Second) of Torts § 413, cmt. b (1965), is a question to be resolved by the finder of fact, not by this court.

### 3. The Survival Statute in Effect at the Time of the Injury Controls.

¶40    The Berretts next contend that the trial court applied the wrong version of Utah's survival statute. The trial court applied the version of the statute in effect at the time of Irene Berrett's injury; the Berretts maintain that the trial court should have applied the version in effect at the time of her death. *Compare* Utah Code Ann. § 78-11-12 (LexisNexis 2002), *with id.* § 78B-3-107 (Supp. 2009). The latter version permits the recovery of general damages; the former does not.

A. The Issue Is Properly Before this Court.

¶41    This issue comes before us in an unusual procedural posture. It was decided by the trial court after Albertsons had been dismissed as a defendant. Originally, the Berretts named both Albertsons and A-1 as defendants. At the close of discovery, the trial court granted summary judgment in favor of Albertsons, but not A-1. With Albertsons no longer a party to the lawsuit, the Berretts proceeded with their claims against A-1, the remaining defendant. The case was set for trial. Then, one week before trial, Irene Berrett died.

¶42    Irene Berrett's untimely death implicated Utah's survival statute. The statute limits what damages are available upon the death of a plaintiff when, as here, the death results from a cause "other than the injury received as a result of the wrongful act or negligence of the wrongdoer." *See id.* § 78-11-12(1)(b) (2002); *id.* § 78B-3-107(1)(b) (Supp. 2009). The statute in effect at the time of Irene Berrett's injury limits recovery to special damages; the statute in effect at the time of her death, however, allows for both special and general damages. *Compare id.* § 78-11-12(1)(b) (2002), *with id.* § 78B-3-107(1)(b) (Supp. 2009). A-1, the remaining defendant in the case, argued that the former applied; the Berretts argued that the latter applied. Albertsons, having been dismissed, did not address the issue. The trial court ruled in favor of A-1 after hearing arguments from both parties.

¶43    The Berretts prevailed at trial but settled their claims with A-1 while post-trial motions were pending. At that point, the Berretts filed a notice of appeal from the trial court's summary judgment in favor of Albertsons and included in their appeal the trial court's ruling on the survival statute. That appeal is now before us. This procedural posture makes Albertsons the appellee on an issue that it did not have an opportunity to argue below and that was decided while it was not a party to the suit.

¶44    This unusual procedural posture notwithstanding, the parties agree that we should resolve the issue now in this appeal given that it is a purely legal issue, *see Berneau v. Martino*, 2009 UT 87, ¶ 9, 223 P.3d 1128, it is fully briefed by both parties to the appeal, and no practical purpose would be served by a remand for the trial court to once again rule (presumably against the Berretts as it did when the issue was last before it), prompting another appeal. We agree. "'Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.'" *State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (quoting *State v. James*, 819 P.2d 781, 795 (Utah 1991)). We therefore address the Berretts' challenge to the trial court's ruling on the survival statute.[7]

B. The Version of the Statute in Effect at the Time of the Injury Controls.

---

[7]In their appellate brief, Albertsons challenged the Berretts' standing to appeal the trial court's ruling on the survival statute, in addition to arguing the merits of the ruling. However, the parties subsequently agreed in oral argument that this court should resolve the issue in the present appeal.

¶45    "Survival statutes provide for the continuance of an injured person's cause of action in order to preserve any interests which have accrued in the recovery of damages to his estate should he die prior to the resolution of his suit." *Kynaston v. United States*, 717 F.2d 506, 511 (10th Cir. 1983) (construing Utah law). Absent a survival statute, a personal injury tort would not survive the death of the victim or the alleged wrongdoer:

> "At common law, actions for personal injury torts . . . do not survive the death of the wrongdoer [or victim]. To remedy this defect, Utah enacted its first survival statute in 1953. The purpose of the statute was not to create a new cause of action as the wrongful death statute did, but rather to abrogate the common law rule of abatement and continue or perpetuate ('survive') a cause of action in existence before the wrongdoer's [or victim's] death."

*Berkemeir v. Hartford Ins. Co.,* 2003 UT App 78, ¶ 13, 67 P.3d 1012 (omission and second alteration in original) (quoting *Kynaston*, 717 F.2d at 509), *aff'd*, 2004 UT 104, 106 P.3d 700. With minor wording differences, the two versions of the statute at issue here agree that "[c]auses of action arising out of personal injury to the person or death caused by the wrongful act or negligence of another do not abate upon the death of the wrongdoer or the injured person." Utah Code Ann. § 78-11-12(1)(a) (LexisNexis 2002); *see also id.* § 78B-3-107(1)(a) (Supp. 2009). In contrast, prior to the enactment of the survival statute, "the decedent's action against the tortfeasor died with him, yet his estate was still obligated to pay his medical bills." *Bybee v. Abdulla*, 2008 UT 35, ¶ 33, 189 P.3d 40.

¶46    The present dispute concerns how much the heirs may recover. While the survival statute confers standing on a victim's heirs, it also limits their recovery. *Id.* At the time of Irene Berrett's injury in January 2006, the 2002 version of the Utah survival statute was in effect. *See* Utah Code Ann. § 78-11-12 (2002). The 2002 survival statute provides for recovery of special damages only:

> If prior to judgment or settlement the injured person dies as a result of a cause other than the injury received as a result of the wrongful act or negligence of the wrongdoer, the personal representatives or heirs of that person have a cause of action against the wrongdoer or personal representatives

> of the wrongdoer *only for special damages occurring prior to death that result from the injury caused by the wrongdoer, including income loss. "Special Damages" does not include pain and suffering, loss of enjoyment of life, and other not readily quantifiable damages frequently referred to as general damages*.

*Id.* § 78-11-12(1)(b) (2002) (emphasis added).

¶47    After Irene Berrett's injury but before her death, the Legislature amended relevant portions of the survival statute. *See id.* § 78B-3-107 (Supp. 2009). Thus, at the time of her death the 2009 survival statute was in effect. The 2009 version expanded the types of damages available to the deceased person's personal representatives or heirs to include limited general damages:

> If, prior to judgment or settlement, the injured person dies as a result of a cause other than the injury received as a result of the wrongful act or negligence of the wrongdoer, the personal representatives or heirs of the person have a cause of action against the wrongdoer or personal representatives of the wrongdoer *for special damages, and general damages not to exceed $100,000,* which resulted from the injury caused by the wrongdoer and which occurred prior to death of the injured party from the unrelated cause.

*Id.* § 78B-3-107(1)(b) (Supp. 2009) (emphasis added).

¶48    Citing *Kynaston v. United States*, 717 F.2d 506 (10th Cir. 1983), the trial court ruled that because survival statutes "allow a decedent's heirs to continue a cause of action already in existence, but do not create a new cause of action, the triggering event must be the date the cause of action accrued, not the date of the person's death." The Berretts challenge this ruling. They argue that the trial court's ruling is contrary to a plain reading of the survival statute and "to the weight of authority on this issue." The Berretts reason that the survival statute only prohibits retroactive application of the statute, and the present case does not involve retroactive application because Irene Berrett died after the 2009 amendment allowing general damages took effect. Albertsons responds that "a personal injury cause of action accrues when the accident

occurs," and "the survival statute does not create a new cause of action but perpetuates portions of [Irene] Berrett's personal injury claims in existence prior to her death."

¶49   We agree with Albertsons and with the trial court. "[P]arties' 'substantive rights and liabilities' are determined by the law in place at the time 'when a cause of action arises, and not [by] a subsequently enacted statute.'" *State v. Clark*, 2011 UT 23, ¶ 12, 251 P.3d 829 (second alteration in original) (quoting *Carlucci v. Utah State Indus. Comm'n*, 725 P.2d 1335, 1336 (Utah 1986)). "[W]e apply the law as it exists at the time of the event regulated by the law in question." *Id.* ¶ 13. "Thus, if a law regulates a breach of contract or a tort, we apply the law as it exists when the alleged breach or tort occurs—i.e., the law that exists at the time of the event giving rise to a cause of action." *Id.*

¶50   By their nature, survival statutes do not give rise to new causes of action; rather, they regulate the viability and scope of preexisting causes of action:

> Survival actions . . . are not based upon the decedent's death, and survival statutes do not create any new claim arising from the event of death. They merely keep the preexisting injury claim alive after death as an asset of the decedent's estate, and limit damages to those that occurred from the time of injury until death.

Andrew Jay McClurg, *It's a Wonderful Life: The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L. Rev. 57, 91 (1990)).

¶51   As noted above, this court has already concluded that the Utah survival statute was enacted "to abrogate the common law rule of abatement and continue or perpetuate ('survive') a cause of action in existence before the wrongdoer's [or victim's] death." *Berkemeir v. Hartford Ins. Co.*, 2003 UT App 78, ¶ 13, 67 P.3d 1012 (alteration in original) (citation and internal quotation marks omitted); *see also id.* ¶ 14. This conclusion is clear on the face of the statute, which even in its 2002 version specifies that personal injury actions "do not abate upon the death of the . . . injured person." Utah Code Ann. § 78-11-12(1)(a) (2002); *see also id.* § 78B-3-107(1)(a) (Supp. 2009). It is true that the statute also states that the "heirs of that person *have a cause of action* against the wrongdoer," *id.* § 78-11-12(1)(b) (2002); *id.* § 78B-3-107(1)(b) (Supp. 2009). But, again as

noted above, our supreme court has described this provision as one that "confers standing on heirs." *Bybee v. Abdulla*, 2008 UT 35, ¶ 33, 189 P.3d 40.

¶52    Our supreme court has also stated that, as its name implies, the Utah survival statute provides "that a deceased person's personal injury action does not abate when that person dies, but rather survives the person's death and may be brought by the deceased's personal representatives or heirs." *Jensen v. IHC Hospitals, Inc.*, 944 P.2d 327, 333 n.3 (citing Utah Code Ann. § 78-11-12). "However," the court continued, "if the person has not brought suit before her death, her personal representatives or heirs may bring suit only if the person died before the time allowed for bringing suit had expired, and then they must bring suit within one year of the person's death." *Id.* (citing Utah Code Ann. § 78-12-37). This would not be the case if the personal representatives or heirs had an independent cause of action that arose upon the death of the injured person.

¶53    Our conclusion here is consonant with the differences between survival statutes and wrongful death statutes generally. "Wrongful death statutes differ from survival statutes conceptually. Whereas survival statutes give the survivors the right to proceed with actions that the decedent would have had, wrongful death statutes provide for the recovery of damages that the survivors suffered personally as a result of the decedent's death." *Simmons v. Hartford Ins. Co.*, 786 F. Supp. 574, 580–81 (E.D. La. 1992) (citing McClurg, *It's a Wonderful Life*, 66 Notre Dame L. Rev. at 93).

¶54    The event giving rise to the cause of action regulated by the Utah survival statute is the underlying tort, not the death of the plaintiff. Therefore, we affirm the trial court's ruling that the 2002 version of the survival statute applies.


CONCLUSION

¶55    Summary judgment is appropriate in negligence cases only in the clearest instances. Here, we believe the Berretts have demonstrated sufficient factual issues to preclude summary judgment. We thus reverse the trial court's grant of summary judgment in favor of Albertsons. In addition, in light of supreme court precedent and strong policy arguments, we conclude that section 413 of the Restatement (Second) of Torts applies as part of the common law in Utah. Finally, we affirm the trial court's

ruling that the version of the Utah survival statute in effect on the date that Irene Berrett's cause of action arose, rather than the version in effect on the date of her death, controls. We remand for trial or such other proceedings as may be appropriate.

_____
J. Frederic Voros Jr., Judge

-----

¶56    WE CONCUR:

_____
Gregory K. Orme, Judge

_____
William A. Thorne Jr., Judge