*This opinion is subject to revision before publication in the Pacific Reporter*

**2014 UT 30**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

TODD GLAITTLI,
*Plaintiff and Appellant,*

*v.*

STATE OF UTAH and JOHN DOES I-V,
*Defendant and Appellee.*

No. 20130119
Filed July 15, 2014

Third District, West Jordan
The Honorable Bruce C. Lubeck
No. 100400120

On Certiorari to the Utah Court of Appeals

Attorneys:

Daniel F. Bertch, Kevin K. Robson, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Bridget K. Romano, Solicitor General,
Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE NEHRING authored the opinion
of the Court, in which CHIEF JUSTICE DURRANT
and JUSTICE DURHAM joined.

JUSTICE LEE filed a concurring opinion,
in which JUSTICE PARRISH joined.

ASSOCIATE CHIEF JUSTICE NEHRING, opinion of the Court:

### INTRODUCTION

¶ 1   This case requires us to once again define the contours of the "natural condition" exception to the waiver provision of the Governmental Immunity Act of Utah.

¶ 2   Appellant Todd Glaittli sued the State of Utah for injuries he suffered when his boat "heaved" and struck him, shattering his

shoulder. Mr. Glaittli claimed his injuries were due to the negligent adjustment of a floating dock at Jordanelle Reservoir, where he kept his boat. The State claimed governmental immunity and moved to dismiss the claim under rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court granted the motion, concluding that Mr. Glaittli's injuries fell within the "natural condition" exception to the waiver of immunity. The court of appeals affirmed. We reverse and hold that a reservoir is not a natural condition on the land under the Utah Governmental Immunity Act, Utah Code section 63G-7-301(5)(k).

## BACKGROUND

¶ 3 Todd Glaittli was the owner of a twenty-five foot cabin cruiser boat that he docked in the marina at Jordanelle Reservoir.[1] The marina, docks, boat slips, and reservoir are owned by the State of Utah and operated by the Utah Division of Parks & Recreation and Jordanelle State Park. Mr. Glaittli's boat was tethered to a boat slip on a floating dock, which was connected to the shore by eight cables. Using a hand-operated winch, State employees could lengthen or shorten the dock cables as needed. The length of the cables was important. Because the dock was floating, its position could be altered by the water level of the reservoir, wind, or other forces that disturbed the water surface. Failure to properly adjust the cables risked allowing the boats to "strike the dock or other boats, especially during periods of wave action." Although the Jordanelle Reservoir master plan recommended the creation of a breakwater to protect the docks from waves, no breakwater was ever built.

¶ 4 In early June 2008, the water levels of Jordanelle Reservoir were rising at a rate of approximately one foot per day, requiring "frequent, if not daily, adjustment of the cable tether length" of the docks. On June 10, 2008, a storm hit the area and

---

[1] Because we are reviewing a motion to dismiss, we state the facts "as they are alleged in the complaint." *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 2, 24 P.3d 958. Additionally, we "accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff." *Id.* (internal quotation marks omitted).

"created large waves on the reservoir." Mr. Glaittli believed the "wave action" created by the storm was "significant enough to warrant personal attention to his boat." When Mr. Glaittli arrived at the marina,

> he saw large waves, causing his large boat to heave to a degree that he feared his boat would strike the dock or other boats. [He] walked out onto the dock, to lengthen the lines on his boat, to allow it to ride the waves more freely . . . . The lines were so taut that he was unable to loosen them. While [Mr. Glaittli] was standing on the dock, he was struck by the bow of his boat, shattering his upper arm and shoulder, causing him to fall to the dock, [resulting in injuries to] his shoulder, arm and other parts of his body.

¶ 5   Mr. Glaittli attributes his injuries to the State's failure to: "adjust the dock level with the water levels;" "warn [him] of an unsafe condition at the docks;" "properly secure the docks;" and finally, to "construct a breakwater" for the marina.

¶ 6   The State claimed governmental immunity and moved to dismiss Mr. Glaittli's complaint. The parties agreed that the activity was a government function, and the State conceded for the purposes of the motion to dismiss that Mr. Glaittli's injury was "proximately caused by a negligent act or omission of an employee committed within the scope of employment"—meaning that governmental immunity would be generally waived.[2]  The district court thus evaluated only whether there was an exception to the general waiver rule that would allow the State to retain its immunity. Proceeding under Utah Code section 63G-7-301(5)(k),

---

[2] UTAH CODE § 63G-7-301(4) ("Immunity from suit of each governmental entity is waived as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment."); *see Blackner v. State*, 2002 UT 44, ¶ 10, 48 P.3d 949 (stating that the inquiry for governmental immunity is "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver").

the district court found that the waves were a "natural condition" that caused Mr. Glaittli's injury, and thus the State retained its immunity. The district court then dismissed Mr. Glaittli's complaint for failure to state a claim upon which relief could be granted. The Utah Court of Appeals affirmed, finding that the water and waves in the reservoir were a natural condition and that Mr. Glaittli's injuries "arose out of, were connected with, or resulted from" that natural condition.[3]

## ISSUES AND STANDARD OF REVIEW

¶ 7 The single question on certiorari presents two distinct issues: (1) whether a reservoir is a "natural condition" under Utah Code section 63G-7-301(5)(k) and (2) if it is, whether Mr. Glaittli's injuries "ar[ose] out of, in connection with, or result[ed] from" that natural condition.[4] Because we hold that the reservoir is not a natural condition, the second issue is irrelevant and we do not address it. We instead remand for further proceedings consistent with this opinion, including a determination of negligence under the negligence waiver provision.

¶ 8 "When reviewing a court of appeals decision affirming a grant of a rule 12(b)(6) motion to dismiss, we review the decisions of the court of appeals rather than that of the trial court . . . for correctness."[5] Moreover, "determining the scope of an exception to the waiver of governmental immunity is a question of statutory interpretation that we also review for correctness."[6]

## ANALYSIS

¶ 9 Whether a reservoir is a "natural condition on [the] land[]" under section 63G-7-301(5)(k) of the Governmental Immunity Act of Utah is an issue of first impression in this court.

---

[3] *Glaittli v. State*, 2013 UT App 10, ¶ 16, 294 P.3d 626.

[4] UTAH CODE § 643G-7-301(5)(k).

[5] *Wagner v. State*, 2005 UT 54, ¶ 9, 122 P.3d 599 (alteration in original) (internal quotation marks omitted).

[6] *Peck v. State*, 2008 UT 39, ¶ 7, 191 P.3d 4; *Francis v. State*, 2013 UT 65, ¶ 19, 321 P.3d 1089 ("[W]hether the district court accurately interpreted the Immunity Act is a legal question that we review for correctness.").

The court of appeals held that the natural condition exception applied because it reasoned that the waves caused Mr. Glaittli's injury, waves are made of water, and the "basic nature" of water is that it is a natural condition.[7] The court of appeals held that the presence of a dam did not "change the basic nature of the water itself" because the water had "simply expanded onto a greater area" (i.e., into the reservoir).[8]

¶ 10  In interpreting the term "natural condition" we cannot focus our inquiry too "broadly," for if we were to do so, the statute's natural condition exception would largely "swallow the Act's waiver of immunity for negligence."[9]  This is because, as we noted in *Grappendorf*, "[c]onsidered broadly, natural conditions include laws of physics, such as gravity, that necessarily contribute to any accident or occurrence."[10]  Moreover, as we noted in *Francis v. State*, "we must exercise caution when interpreting an inexact term" (like "natural") because "its meaning could be stretched to include almost anything."[11]  The court of appeals reached its conclusion by focusing on whether the wave and the water it was made of were a "natural condition."  This was error.[12]

¶ 11 In *Blackner v. State*, an avalanche fell onto a road, injuring the plaintiff.[13]  We held that the avalanche was a natural

---

[7] *Glaittli v. State*, 2013 UT App 10, ¶ 17, 294 P.3d 626.  Thus, the court of appeals did not hold that the reservoir is a natural condition, as the question presented on certiorari suggests.  It held that "the water upon which the wind acted was a natural condition." *Id.*

[8] *Id.*

[9] *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 11, 173 P.3d 166.

[10] *Id.*

[11] *Francis v. State*, 2013 UT 65, ¶ 45, 321 P.3d 1089.

[12] Following such reasoning leads to an absurdity given that everything can be viewed as "natural" at some level. *See, e.g.,* *Grappendorf*, 2007 UT 84, ¶ 11.

[13] 2002 UT 44, ¶¶ 2–6, 48 P.3d 949.

condition.[14] The instant case is distinguishable because a road is separate and distinct from an avalanche in a way that waves are not separate and distinct from the body of water on which they occur. The waves and the body of water are "so closely related" that they "cannot be encountered independently."[15] Thus, the court of appeals focused too broadly[16] when it considered the "basic nature" of water itself.[17] The proper question is whether the *reservoir* was a natural condition upon the land. We hold that it was not.

¶ 12 Our statute reads, in pertinent part,

> [i]mmunity from suit of each governmental entity is waived as to any injury proximately caused by a negligent act or omission of an employee . . . . [But is] not waived . . . if the injury arises out of, in connection with, or results from . . . (k) any natural condition on publicly owned or controlled lands.[18]

In other words, the government loses its immunity if a government employee negligently causes injury, but negligence or not, the government retains its immunity if the injury arose out of a natural condition on public lands.[19]

---

[14] *Id.* ¶ 16.

[15] *Davis v. State*, 30 P.3d 460, 463 (Wash. 2001) (distinguishing *Ravenscroft v. Wash. Water Power Co.*, 969 P.2d 75 (Wash. 1998) and holding that tire tracks in sand leading to a drop off was not an artificial condition and was thus fundamentally different from the condition in *Ravenscroft*, where a reservoir was an "artificial external circumstance" that "could not reasonably be analyzed as independent" from a submerged stump).

[16] *Grappendorf*, 2007 UT 84, ¶ 11.

[17] *Glaittli*, 2013 UT App 10, ¶ 17.

[18] UTAH CODE § 63G-7-301(4), (5).

[19] The State concedes that its activities served a governmental function. The State also concedes, for the purpose of the motion to dismiss only, that there is "an initial immunity waiver because [Mr.] Glaittli alleged that his injuries were 'proximately caused by a negligent act or omission of an employee committed within the

con't.

¶ 13 A reservoir is topographical in nature and, following our recent decision in *Francis*, is thus indisputably a "condition on the land."[20] The question then, is whether a reservoir is "natural." We hold that it is not. In *Grappendorf*, we defined "natural" as "[p]resent in or produced by nature."[21] According to *Black's Law Dictionary*, something natural is "[b]rought about by nature as opposed to artificial means."[22] As the Illinois Supreme Court reasoned in 2008, "unlike a natural body of water, which exists because of natural processes, an artificial body of water is the result of someone's labor."[23] And a reservoir is certainly brought about by human labor.[24]

¶ 14 Jordanelle Dam and Reservoir was constructed from 1987 through 1992 by the United States Bureau of Reclamation in order

---

scope of employment.'" *Glaittli*, 2013 UT App 10, ¶ 7 (quoting UTAH CODE section 63G-7-301(4)).

[20] 2013 UT 65, ¶ 42 ("'condition on the land' seems to connote features that have a . . . tie to the land itself, such as rivers, lakes, or trees. . . . We accordingly limit application of the natural condition exception to those conditions that are closely tied to the land or that persist 'on the land'—conditions that are topographical in nature.").

[21] *Grappendorf*, 2007 UT 84, ¶ 10 (alteration in original).

[22] BLACK'S LAW DICTIONARY 1126 (9th ed. 2009).

[23] *Alderson v. Fatlan*, 898 N.E.2d 595, 601 (Ill. 2008) (discussing whether a water-filled quarry was an "artificial body of water" for purposes of riparian water rights); *see also Davis*, 30 P.3d at 462 ("'[A]rtificial' means 'contrived through human art or effort and not by natural causes detached from human agency: relating to human direction or effect in contrast to nature . . . formed or established by man's efforts, not by nature.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 124 (1986))).

[24] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1931 (1961) (defining reservoir as "a place where water is collected and kept in quantity for use when wanted; *esp*: *an artificial lake in which water is impounded* for domestic and industrial use, irrigation, hydroelectric power, flood control, or other purposes" (emphasis added)).

7

to store water for municipal and industrial use.[25]  After it was built, a highway had to be relocated and two small towns were completely submerged.[26]  The reservoir was thus imagined, built, and brought about by "human efforts," not nature.[27]  Were it not for human efforts in building the Jordanelle Dam, the Jordanelle Reservoir would not exist and in its place would remain the naturally flowing Provo River.[28]

---

[25] *Jordanelle Dam*, UNITED STATES BUREAU OF RECLAMATION, https://www.usbr.gov/projects/Facility.jsp?fac_Name=Jordanelle+Dam&groupName=Overview (last updated Mar. 5, 2009).

[26] *Jordanelle Reservoir*, WIKIPEDIA.COM, http://en.wikipedia.org/wiki/Jordanelle_Reservoir (last updated Mar. 21, 2014); Frank Brusca, *Jordanelle Reservoir/Ross Creek Valley*, ROUTE40.NET, http://www.route40.net/page.asp?n=10846 (last updated Dec. 23, 2010, 5:32 PM).

[27] *Davis*, 30 P.3d at 462 n.2; *see also Ravenscroft*, 969 P.2d at 82 (acknowledging that a reservoir is artificial because "[t]he natural water channel was enlarged artificially . . . [and] was not configured by nature but by man").

[28] *Weber ex rel. Weber v. Springville City*, cited by the State, is inapposite. 725 P.2d 1360 (Utah 1986). In that case we noted that "a natural watercourse does not cease to be such because of artificial changes" such as being "artificially obstructed, and all the water diverted therefrom, as where the water has all been dammed at a place far up the stream." *Id.* at 1366 (internal quotation marks omitted).  This quotation cites principles of water law that are inapplicable here.  In *Weber*, the court was concerned with the question of whether a creek was a "natural watercourse" for purposes of the attractive nuisance doctrine.  *Id.* at 1364. However, here we are asked to interpret "natural condition" as used in the Governmental Immunity Act of Utah.  Mr. Glaittli's claim does not concern the flow of the Provo River into or out of the reservoir, and the question posed by this case is not one of common tort or water law.  Accordingly, we conclude that *Weber* is distinguishable.

¶ 15 Because the reservoir was designed and created by human activity, and because it would not exist but for that activity, we hold that the Jordanelle Reservoir is not a natural condition on the land.

## CONCLUSION

¶ 16   We therefore reverse and remand to the district court for a determination of whether a government employee proximately caused Mr. Glaittli's injury through a negligent act or omission and for all other proceedings as necessary and consistent with this opinion

———————————

JUSTICE LEE, concurring in the judgment:

¶ 17   I concur in the majority's decision reversing the grant of summary judgment in favor of the State, but write separately to offer an alternative understanding of the statutory construct of a "natural condition on [the] land " under Utah Code section 63G-7-301(5)(k). Thus, I agree that the Jordanelle Reservoir is not a "natural condition on [the] land[]" for which the government is immune. But I find the court's conception of that statutory construct—initiated in prior cases and extended in the majority opinion today—to be unworkable and insufficiently connected to the text of the statute. In this opinion I propose an alternative approach rooted in a term-of-art conception of "natural condition" from premises liability in tort law. The goal is to preserve the results of our prior cases while providing workable guidance going forward.

¶ 18   The statutory construct of a "natural condition on [the] land[]" has bedeviled our court for years. We have appropriately noted that a broad, literal interpretation of "natural condition" would encompass "laws of physics, such as gravity, that necessarily contribute to any accident or occurrence." *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 11, 173 P.3d 166. And we have rightly worried that an undue extension of the natural condition exception could "swallow" the statute's "waiver of immunity for negligence." *Id.*; *see also Francis v. State*, 2013 UT 65, ¶ 45, 321 P.3d 1089 (expressing the need for "caution" in interpreting this "inexact term" in a manner that "could be stretched to include almost anything").

¶ 19   As I have noted previously, this problem is magnified by our court's commitment to a but-for test of causation—a test that

allows any incidental connection to the natural condition exception (or to any of a number of other immunity-invoking exceptions) to override the statute's waiver of immunity for acts of negligence and the like. *See Thayer v. Wash. Cnty. Sch. Dist.*, 2012 UT 31, ¶¶ 52–66, 285 P.3d 1142 (Lee, J., dissenting) (criticizing the "some causal relationship" formulation in the caselaw). That standard is problematic. It is incompatible with the structure of the Governmental Immunity Act, which first broadly waives immunity for injuries caused by nonimmune acts (such as negligence), *see* UTAH CODE § 63G-7-301(1)–(4), and then reinstates immunity in instances where the injury actually arises from other enumerated acts or occurrences (such as conditions on the land), *id.* § 63G-7-301(5). By broadly treating a natural condition with any "causal nexus" to an injury as a basis for an exception triggering governmental immunity, our cases enhance the problem of a broad "natural condition" immunity swallowing the government's waiver for its acts of negligence.

¶ 20  Our "natural condition" cases have gone to some lengths to navigate around these rocky problems. First, in *Blackner v. State*, we conceptualized an avalanche as a "natural condition" sustaining immunity and held that immunity attached despite the plaintiffs' argument that the proximate cause of the injury was the government defendants' negligence in stopping traffic in a manner that put the plaintiffs at risk of harm from the avalanche. 2002 UT 44, ¶¶ 13–16, 48 P.3d 949. Then, in *Grappendorf*, we acknowledged that a gust of wind was in some sense "natural," but nonetheless declined to extend immunity to an accident caused when wind interacted with an artificial pitcher's mound at a baseball park, suggesting that a "transient" force of nature does not "exist on the land as required by the plain language of the statute." 2007 UT 84, ¶ 10. And in so doing, we emphasized the need to "avoid an interpretation that nullifies the Act's waiver of immunity." *Id.* ¶ 11. Most recently, in *Francis v. State*, we applied the *Grappendorf* analysis in a manner foreclosing immunity for injury caused by an attack by a wild bear, concluding that the bear was too "transitory" to be considered a natural condition on the land. 2013 UT 65, ¶ 42. In *Francis*, we sought to distinguish "topographical" features like rivers, lakes, and trees, which were "directly a part of and persist 'on the land'" from wild animals not as "closely tied to the land." *Id.*

¶ 21  These decisions seem commendable as an exercise in furtherance of the goal of preserving a role for the "natural condition" exception that does not swallow the waiver of immunity for government negligence. But to me they appear to be more of an ad hoc effort to secure fair outcomes than an attempt to announce a consistent understanding of the statutory text. Indeed, the analysis of the exception as applied in this case seems to me to emphasize that point.

¶ 22  The majority reverses the court of appeals for its simplistic treatment of the question whether the waters of the Jordanelle are "natural," finding error in the assertion that water emanating from the Provo River is always and forever a "natural condition." *Supra* ¶¶ 9, 11. Yet, the court's analysis is equally simplistic. The majority is right to conclude that "[w]ere it not for human efforts in building the Jordanelle Dam, the Jordanelle Reservoir would not exist and in its place would remain the naturally flowing Provo River." *Supra* ¶ 14. But that is only to say that a nonnatural condition was essential to the current existence of the Jordanelle Reservoir. And the same can be said of a natural condition: Were it not for the naturally flowing Provo River, the Jordanelle Reservoir would not exist and in its place would be a barren valley.

¶ 23  The point is that the question whether the waters of the Jordanelle are natural or nonnatural is not a matter for abstract logic. It is a matter for statutory interpretation—for a determination whether the terms of our statute give controlling significance to a natural condition (naturally flowing waters) or a nonnatural condition (a dam) when both come together to create a condition essential to a danger contributing to an injury.

¶ 24  To address this question, we must do more than espouse the need to avoid an overbroad, rule-swallowing exception for natural conditions. (After all, the converse concern is also there— of avoiding an understated, meaningless formulation of natural conditions that would deprive it of any meaningful application.) We must give substantive content to the text of the statute, in a manner that will allow both litigants and lower courts to apply it in a predictable manner.

¶ 25  The question, then, is whether the statutory notion of a "natural condition on [the] land[]" encompasses conditions that are formed by the confluence of both natural and man-made

elements. I would answer that question on the basis of a reconsideration of the meaning of those terms. And in so doing, I would look to the common-law background of the operative terms of the Governmental Immunity Act—to terms rooted in established common-law terminology since before the adoption of that statute.

¶ 26 The key statutory provisions seem to me to incorporate classic terms of art from premises liability in the law of tort. Thus, the statute waives immunity for any injury caused by "a defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located on them" (unless such condition is "latent"), and for any injury caused by "any defective or dangerous condition of a public building, structure, dam, reservoir, or other public improvement" (but with another caveat for "latent" conditions). UTAH CODE § 63G-7-301(3). The exception at issue here is a counterpart to these provisions, reinstating immunity for an injury that arises out of "any natural condition on publicly owned or controlled lands." *Id.* § 63G-7-301(5)(k).

¶ 27 The references to "dangerous conditions," "latent conditions," and "natural conditions" are apparent invocations of terms of art from premises liability in the law of tort. Under firmly rooted principles of premises liability, a possessor of property may be liable to an invitee or licensee if he fails to exercise reasonable care necessary to protect them from a known "dangerous condition" on the land. RESTATEMENT (SECOND) OF TORTS § 343 (1965); *Tallman v. City of Hurricane*, 1999 UT 55, ¶ 9, 985 P.2d 892 ("The creator of an artificial condition on land may be liable to others—both upon or outside of the land—for physical harm caused by its dangerous nature."); *Rogalski v. Phillips Petroleum Co.*, 282 P.2d 304, 307 (Utah 1955) ("The duty owed by an owner of land to a business visitor is to inspect and maintain his premises in a reasonably safe condition or to warn the visitor of any dangerous conditions existing thereon."); *Erickson v. Walgreen Drug Co.*, 232 P.2d 210, 212 (Utah 1951) (citing and adopting the Restatement standard). This principle is also reflected in the law of nuisance, which subjects a possessor of land to liability for "abatable artificial condition[s] on the land" if the possessor knows of the condition, knows or should know that it exists without the consent of those affected by it, and fails to take reasonable steps to abate it. RESTATEMENT (SECOND) OF TORTS § 839

(1979); *Finkelstein v. Huner*, 77 A.D. 424, 426–27 (N.Y. App. Div. 1902) (upholding damages based on failure to abate the danger from the artificial condition of a privy and cesspool); *Rose v. Standard Oil Co. of New York*, 185 A. 251 (R.I. 1936) (leaking oil and gas from a refinery is actionable as nuisance).

¶ 28 The reference to "natural conditions on [the] land[]" is also borrowed from the tort law of premises liability. Under longstanding principles of tort law, a possessor of land is not "liable for physical harm caused to others outside of the land by a natural condition of the land." RESTATEMENT (SECOND) OF TORTS § 363(1) (1965); *McCarthy v. Ference*, 58 A.2d 49, 53 (Pa. 1948) ("[G]enerally speaking, . . . a landowner is not subject to liability for bodily harm caused to others outside the land by a natural condition of the land. . . ."). And this principle again is also reflected in the law of nuisance. Nuisance law provides that "a possessor of land is not liable to persons outside the land for a nuisance resulting solely from a natural condition of the land," RESTATEMENT (SECOND) OF TORTS § 840(1) (1979),[1] while defining "natural condition" as "a condition that is not in any way the result of human activity." *Id*. cmt. a; *Livezey v. Schmidt*, 29 S.W. 25, 25 (Ky. 1895) ("[A]s expressed in text-books, in order to create a legal nuisance, the act of man must have contributed to its existence." (internal quotation marks omitted)); *Salmon v. Delaware, L. & W.R. Co.*, 38 N.J.L. 5, 11 (N.J. 1875) (natural conditions are those that are "purely sequences of natural causes"); *Roberts v. Harrison*, 28 S.E. 995, 996 (Ga. 1897) (natural conditions are "due solely to natural causes").

¶ 29 These constructs are well-rooted in settled caselaw established long before the date of the enactment of our Governmental Immunity Act. And because the terms of the

---

[1] *Salmon v. Delaware, L. & W.R. Co.*, 38 N.J.L. 5 (N.J. 1875) (dead leaves and dry grass that caught on fire not a nuisance); *Roberts v. Harrison*, 28 S.E. 995, 996 (Ga. 1897) (stagnant pond emitting noxious gases not a nuisance as "[i]ll results, however extensive or serious, that flow from natural causes, cannot become a nuisance"); *Harndon v. Stultz*, 100 N.W. 851 (Iowa 1904) (noxious weeds spread to neighboring property by action of wind not a nuisance); *Langer v. Goode*, 131 N.W. 258 (N.D. 1911) (same).

statute are an apparent adoption of settled legal terms, I would construe the statutory terminology to embrace the term-of-art understanding embedded in these words.

¶ 30  A "word or phrase" that "is 'transplanted from another legal source, whether the common law or other legislation,'" is understood to "'bring[] the old soil with it.'" *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). That seems clearly to be the case here. It can be no accident that the relevant, operative terms of the Governmental Immunity Act—those addressed to the government's immunity as regards its role as possessor of land or other property—coincide with the key terms that have long been used to define the scope of premises liability in tort.

¶ 31  Thus, I would read the statute's reinstatement of immunity for injury arising out of a "natural condition on [the] land[]" as a transplant from premises liability in tort law. And I would interpret that term in a manner incorporating the "old soil" that it has long carried at common law.

¶ 32  That understanding is not only faithful to the text of the statute; it also addresses the above-noted concern for avoiding an overly expansive interpretation of the natural condition exception. And it is also compatible with the results of our cases.

¶ 33  The longstanding common law concept of "natural conditions" is straightforward. It defines a "natural condition" as a "condition of land [that] has not been changed by any act of a human being." RESTATEMENT (SECOND) OF TORTS § 363, cmt. b. It also contrasts natural conditions with artificial ones, which are defined as "structure[s] erected upon land" and "trees or plants planted or preserved, and changes in the surface by excavation or filling, irrespective of whether they are harmful in themselves or become so only because of the subsequent operation of natural forces." *Id.* § 363 cmt. b; *Mills v. Hall & Richards*, 9 Wend. 315, 316 (N.Y. Sup. Ct. 1832) (pond created by man-made dam was an artificial condition); *Towaliga Falls Power Co. v. Sims*, 65 S.E. 844, 846–49 (Ga. Ct. App. 1909) (pond created by artificial dam and attendant mosquitoes); *McCarthy*, 58 A.2d at 50–53 (rockslide on natural hill that was weakened by the construction of a highway); *Andrews v. Andrews*, 88 S.E.2d 88 (N.C. 1955) (wild geese attracted

by bait and a man-made pond). Thus, as conceptualized in the Restatement (Second) of Torts, a natural condition:

> comprehends soil that has not been cultivated, graded or otherwise disturbed; water that is on the land wholly through natural causes; trees, weeds and other vegetation on land that has not been made artificially receptive to it by act of man; and birds, animals or insects that have not been brought upon it or attracted by act of man. The term does not comprehend conditions that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the subsequent operation of natural forces.

RESTATEMENT (SECOND) OF TORTS § 840 cmt. a.

¶ 34 This standard incorporates a natural brake against the concern about the "natural condition" exception swallowing the statutory waiver of immunity for negligence and other acts and conditions. *See Grappendorf*, 2007 UT 84, ¶ 11; *Francis*, 2013 UT 65, ¶ 45. It clarifies that immunity for natural conditions does not extend to "conditions that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the subsequent operation of natural forces." RESTATEMENT (SECOND) OF TORTS § 840 cmt. a.

¶ 35 That proviso avoids the rule-swallowing effect of the notion that a literal interpretation of "natural condition" would encompass "laws of physics, such as gravity, that necessarily contribute to any accident or occurrence." *Grappendorf*, 2007 UT 84, ¶ 11. It does so by indicating that immunity is not invoked for "conditions that would not have arisen but for the effect of human activity," a caveat that forecloses immunity for injuries traceable to "laws of physics" through their interaction with artificial elements.

¶ 36 The common law formulation of "natural condition" also preserves the results of our prior cases. Under the tort law formulation, an avalanche is a condition that "has not been changed by any act of a human being." RESTATEMENT (SECOND) OF TORTS § 363 cmt. b. It is essentially "water that is on the land

wholly through natural causes," and by no means a "condition[] that would not have arisen but for the effect of human activity." *Id.* § 840 cmt. a. The common-law, term-of-art understanding of the natural condition exception is accordingly consistent with the result in *Blackner*, which extended the exception to confer immunity as to claims arising out of an avalanche. *Grappendorf* is also sustainable under this approach, as a pitcher's mound propelled by a gust of wind is a condition "that would not have arisen but for the effect of human activity even though the conditions immediately resulting from the activity were harmless in themselves and the harmful condition has arisen through the operation of natural forces." *Id.*; *Grappendorf*, 2007 UT 84.

¶ 37 The *Francis* case might seem a bit more difficult to sustain under the common law understanding of natural conditions, since the above formulation expressly encompasses "birds, animals or insects that have not been brought upon [the land] or attracted by act of man." RESTATEMENT (SECOND) OF TORTS § 840 cmt. a. But although "black bears are native to Utah," there was evidence in *Francis* that the State defendants had been aware that the bear at issue "had found food" at the campground in question and "would likely return if attracted" by humans or food. 2013 UT 65, ¶¶ 8, 11. So there arguably was a material dispute in *Francis* as to whether the bear had been "attracted by act of man." And if so the result in *Francis*—reversal by our court of a summary judgment decision in favor of government defendants on "natural condition" immunity grounds—could also be sustained. *See also Maynard v. Carey Constr. Co.*, 19 N.E.2d 304 (Mass. 1939) (infestation of cockroaches attracted to a dump).

¶ 38 I would apply this standard to this case. Thus, I would interpret the statutory exception for "natural condition[s] on [the] land[]" to extend only to conditions that have "not been changed by any act of a human being," RESTATEMENT (SECOND) OF TORTS § 363 cmt. b, or in other words not to "comprehend conditions that would not have arisen but for the effect of human activity." *Id.* § 840 cmt. a. And because the Jordanelle Reservoir is a condition affected substantially by human activity (the construction of the Jordanelle Dam), I would hold that the reservoir is not a natural condition and thus that immunity is not reinstated under the statutory exception in Utah Code section 63G-7-301(5)(k).

¶ 39   This common law, term-of-art understanding of "natural condition[s] on [the] land[]" incorporates its own inherent standard of causation.[2] It tells us, by reference to common-law principles of premises liability, that any human or artificial element that interacts with a natural condition in a material way transforms the previously natural condition into an artificial one. And it therefore also preserves independent meaning for both the statutory proviso that immunity is generally waived for injuries caused by defective or dangerous (and nonlatent) conditions of "reservoirs," UTAH CODE § 63G-7-301(3)(a)(ii) & (b)(ii), and for the statutory exception reinstating waiver (even as to injuries caused by defective or dangerous conditions of reservoirs) if the injury arises out of "any natural condition on [the] land[]," *id.* § 63G-7-301(5)(k).

¶ 40   The term-of-art understanding of "natural conditions" allows us to make sense of both the general waiver for dangerous, nonlatent conditions of reservoirs and the specific exception for natural conditions. It does so by crediting the general waiver in circumstances in which a natural condition (such as water flowing in a river) interacts with an artificial condition (such as a dam)—rendering the otherwise natural water an artificial "dangerous condition" (a reservoir). And the implication for the exception reinstating immunity for "natural conditions" is parallel: Where the injury results only from a natural condition, and not at all from any interaction with an artificial element, then immunity is reinstated even for injuries generally (in a but-for sense) connected to a dangerous artificial condition like a reservoir.

¶ 41   That construct triggers the statutory waiver of immunity for the injuries at issue in this case, which were allegedly caused

---

[2] For that reason, I would not reach the broader question of the general viability of our "some causal nexus" standard of causation for exceptions to waivers of immunity. *See supra* ¶ 19. But I would flag the question as meriting careful reconsideration in a future case. *See Thayer*, 2012 UT 31, ¶ 29–69, 285 P.3d 1142 (Lee, J., dissenting). In my view, the court should inquire as to whether the natural condition was not only the actual cause of the injury, but the legal or proximate cause as well, as viewed through traditional tort principles. I see this approach as mandated by the text and structure of the Act.

by the dangerous, artificial condition of the Jordanelle Reservoir in a manner not implicating the statutory exception for natural conditions. That is because all of the allegations of negligence in this case are closely connected in a material way to interactions between natural and artificial elements. *See supra* ¶ 5. Thus, although Glaittli's injuries were a result of natural conditions of wind and weather, the harm he suffered arose out of interactions of those elements with the artificial condition of the Jordanelle Reservoir (as waves are not caused by wind alone but by the interaction with a large body of artificial water—a "condition[] that would not have arisen but for the effect of human activity," RESTATEMENT (SECOND) OF TORTS § 840 cmt. a.[3]

¶ 42   I would reverse the court of appeals on that basis. And in so doing I would repudiate our ad hoc conception of the natural condition exception and replace it with a framework rooted in the common-law, term-of-art understanding of the statutory terminology. I concur in the judgment of the court on that basis.

———————

---

[3] A contrary conclusion might well obtain if, for example, Glaittli had been struck by lightning while perched on the dock at Jordanelle. In that event, perhaps it could be said that his injury was not at all a result of an interaction between natural conditions (weather) and artificial ones (the reservoir), since it could not be said that a lightning strike is a "condition[] that would not have arisen but for the effect of human activity." RESTATEMENT (SECOND) OF TORTS § 840 cmt. a. At a minimum, such a question might be one for a jury, and the possibility of this conclusion preserves application for both the subsection (3) proviso that immunity is waived for dangerous, nonlatent conditions of reservoirs and for the subsection (5) exception that immunity may still be reinstated if an injury results from a natural condition.